Yvonne G. TROUT, et al., Plaintiffs,

v.

H. Lawrence GARRETT, III,
et al., Defendants.

Civ. A. No. 73–0055 (HHG).

United States District Court,
District of Columbia.

Nov. 27, 1991.

**1400**

Bradley G. McDonald, John F. Karl, Jr., McDonald & Karl, Washington, D.C., for plaintiffs.

Thomas S. Rees, Asst. U.S. Atty., Washington, D.C. (Matthew J. Wheeler, Karen McCoy, Richard D. Hipple, Daniel E. O'Connell, Jr., Attys., Office of the General Counsel, U.S. Dept. of the Navy, of counsel), for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

### I

#### Background

This case began in 1973,[1] over eighteen years ago, when several complaints charging sex discrimination by the Department of the Navy in violation of Title VII of the Civil Rights Act of 1964 were filed in this Court.[2] The Court consolidated the complaints, and it certified a class of plaintiffs consisting of civilian women employees who between June 6, 1972 and June 4, 1979 worked for an agency of the Department of the Navy originally called NAVCOSSACT[3] and later NARDAC[4] (sometimes collectively referred to herein as NARDAC), the Navy's computer operations center. At a two-week trial, forty-two witnesses were heard, and over 7,500 pages of exhibits were admitted. The Court ultimately decided that plaintiffs had proved discrimination by the Navy against the class in violation of Title VII. *Trout v. Hidalgo*, 517 F.Supp. 873 (D.D.C.1981).

The Court of Appeals affirmed the decision on liability but reversed part of the conclusions drawn by this Court from the parties' statistical evidence. Specifically, the Court of Appeals held that (1) Title VII liability could not be based upon the continuing effects of discrimination occurring prior to March 24, 1972, and (2) the Navy and its officials were not responsible for discrimination in hiring when the hiring grades and salaries were predetermined by another agency. The Court of Appeals accordingly reversed the trial finding of discrimination in initial grade placements. *Trout v. Lehman*, 702 F.2d 1094, 1103–05 (D.C.Cir.1983). However, the appellate court also concluded that the evidence created a justifiable inference of discrimination in promotions that had not been rebutted by the Navy,[5] and it accordingly upheld this Court's finding of class-wide discrimination in promotions.

The Supreme Court granted certiorari, and it remanded the case for findings of fact on the limited issue of the evidentiary effect of the parties' statistics, in view of the different approaches taken by this Court and the Court of Appeals. *Lehman v. Trout*, 465 U.S. 1056, 104 S.Ct. 1404, 79 L.Ed.2d 732 (1984). On remand, this Court,

---

1. The administrative complaint was initiated even earlier, in June 1972.

2. The Act was amended in 1972 by the Equal Employment Opportunity Act. 42 U.S.C. §§ 2000e to 2000e–17.

3. Naval Command Systems Support Activity.

4. Navy Regional Data Automation Center.

5. For more clarity and understanding, the Court will generally refer to the defendants as the "Navy," except where specific government litigation actions are at issue. In such situations, the term "Department of Justice counsel" or "Justice counsel" will be used, as the actual litigation work has been handled by the Office of the United States Attorney, a unit under the jurisdiction of the Department of Justice.

following appropriate proceedings in conformity with the appellate decisions, again determined that the Navy was guilty of sex discrimination and liable to the plaintiff class. *Trout v. Lehman*, 652 F.Supp. 144 (D.D.C.1986). The Court further ruled, in accordance with the Navy's request, that individual hearings would be held for the class members in order to determine their entitlement to relief. *Trout v. Webb*, 708 F.Supp. 358 (D.D.C.1988).

Due to the anticipated number and complexity of the hearings, the individual claims were referred to a Special Master[6] pursuant to Rule 53(b) of the Federal Rules of Civil Procedure. The Special Master was also instructed to determine which statistical methodology was most appropriate for use in determining backpay for the individuals.[7]

Proofs of Claim were filed on behalf of 93 claimants. Notwithstanding the decisions of this Court finding discrimination against the class, the government opposed all but 5 of these claims[8] on the basis that the individuals had not been discriminated against. The effect of the Navy's action was to require the 88 remaining individuals to prove discrimination all over again, although, as a matter of law, once a finding of discrimination has been made in favor of the class, individual class members need to make only a minimal showing to be entitled to relief, *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 259 (5th Cir.1974); *Baxter v. Savannah Sugar Refining Corp.*, 495 F.2d 437, 445 (5th Cir.1974), and a finding in the class' favor is therefore normally accepted by defendants in Title VII litigation with respect to all or all but a few of the class members.

Following briefing and argument, the Special Master ruled on January 11, 1990 that 32 members of the class were entitled to summary judgment on the issue of entitlement to relief pursuant to *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 361–62, 97 S.Ct. 1843, 1867–68, 52 L.Ed.2d 396 (1977), which included summary judgment that was granted to the 5 class members whose claims were not contested by the Navy; summary judgment was granted in favor of the Navy in 16 cases where the claimants could not satisfy the initial burden imposed by *Teamsters* or where the Navy successfully rebutted the plaintiffs' claim; and 10 cases were dismissed where the claimants were found to have opted out of the class. Due to factual ambiguities, the issue of entitlement to relief of the remaining 35 class members was set by the Special Master for individual evidentiary hearings.[9]

The Special Master thereafter held extensive evidentiary hearings to determine the most appropriate form of regression analysis model to be used in computing backpay relief for those who were entitled to such relief. On March 30, 1990, he issued initial conclusions regarding the form of the regression analyses and he identified areas that required additional examination. On December 27, 1990, the Special Master issued his Second Memorandum and Order on the Most Appropriate Form of Regression Analysis to be Used in Determining

---

**6.** The Special Master in this case was Lawrence Speiser, Esq. Mr. Speiser had become expert in civil rights litigation through his work as director of the Washington Office of the American Civil Liberties Union and subsequently in private practice. He also served as an arbitrator for the D.C. Superior Court and in disputes between nationwide labor unions. In 1979, he was on a panel of three proposed by the D.C. Judicial Nominations Commission for a vacancy on the District of Columbia Court of Appeals, but he withdrew his name when he learned that he was suffering from a serious illness. Mr. Speiser died on August 30, 1991, following a career of most productive service to the administration of justice in general and to this case in particular.

**7.** The Special Master was granted the authority to require briefing and hold hearings on that question if necessary. *Trout v. Webb*, 708 F.Supp. 358 (D.D.C.1988).

**8.** Even as to these 5 claimants, the government subsequently attempted to renege on its concession. *See* Section VI–C, *infra*.

**9.** Just as the evidentiary hearings were due to begin, the Navy stated that it would not contest the entitlement to relief of these 35 class members. With respect to that history, *see* p. 1423, *infra*.

Backpay Relief for Class Members (Regression Memorandum II).

Both parties have filed motions requesting that the Court reverse or modify rulings of the Special Master in accordance with their respective objections. All these objections are decided herein pursuant to Fed.R.Civ.P. 53(e).[10] The standard of review for the rulings of the Special Master is *de novo* as to legal questions, and clearly erroneous as to factual issues. *See Oil, Chemical and Atomic Workers International Union, AFL–CIO v. NLRB,* 547 F.2d 575, 580 (D.C.Cir.1976); *see also, Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## II

### *Specific Navy Objections to Special Master Conclusions*

#### A. Discrimination in Grade at Hire

■ The Navy objects to the Special Master's consideration of cases in which the discrimination allegedly occurred in the particular plaintiff's grade placement at time of hiring. The argument is that at-hire discrimination was not within the Special Master's jurisdiction or that of this Court because the Court of Appeals, when it reviewed this Court's 1981 finding of class-wide discrimination, limited the liability of the Navy to discrimination in promotions, removing at-hire grade placement as a basis for any of plaintiffs' claims.

This line of argument misconstrues the Court of Appeals decision. As indicated above, the Court of Appeals did rule that discrimination at hire was not, in and of itself, a basis for liability. But as also noted above, the appellate court also concluded, explicitly affirming this Court's prior ruling, that a showing of discrimination at hire is relevant to the issue of whether plaintiffs were equitably promoted by the Navy and may be considered on that issue. *See Trout v. Lehman, supra,* 702 F.2d at

1105 (*quoting Trout v. Hidalgo,* 517 F.Supp. at 881, 885).

The Navy's attempt to bypass that appellate ruling ignores the complex fabric of discrimination in which issues such as these are often woven together. It is certainly true that the Navy is not liable for at-hire grade placements made by agencies outside the Department of the Navy. The Special Master did not conclude otherwise. It is also true that the issue of liability must be focused on discrimination in promotions. But where a plaintiff is able to show (1) that her initial placement was in the control of the Navy,[11] or (2) that she was placed at a grade level beneath her qualifications, whether by the Navy or by any other executive agency, and the Navy did not thereafter promote her in an equitable manner, discrimination in violation of Title VII may be found. The evidence disclosed and the Special Master found numerous examples in both categories.

To cite just one such occurrence in each group, the evidence showed with respect to initial placement that Brenda J. Weaver was hired by NAVCOSSACT at a GS–9 even though her education and experience qualified her to be a GS–11, because the Director of Personnel of that Navy unit informed her, according to Ms. Weaver's proof of claim, that "a married woman did not need as much money as a GS–11 mathematician was being paid." Special Master Memorandum (January 11, 1990) at 66.

As for discrimination in promotions, the record shows that Patricia H. Fox was rated on the Civil Service Register as a GS–7 computer programmer. Ms. Fox had a bachelor's degree in mathematics from Middleberry College, post-graduate training with IBM, and work experience in computer programming and systems design that consisted of four summers in college and two and one-half years full-time. Although Ms. Fox asserted that the Civil Service improperly rated her as a GS–7 rather than a GS–9 at the time of her

---

**10.** The parties have expressly waived a hearing on the objections pursuant to Fed.R.Civ.P. 53(e)(2).

**11.** The commanding officer of NAVCOSSACT testified that "we had substantial leeway in bringing people aboard at various levels." Special Master Memorandum (January 11, 1990) at 47 n. 19.

hiring, her claim in this litigation was predicated upon the failure of NARDAC subsequently to promote her to GS–9 when her qualifications and work performance warranted such a promotion. Special Master Memorandum (January 11, 1990) at 57.

That these were not isolated examples but typical of the practices at NARDAC is evidenced by the Special Master's detailed findings which are consistent with the general statistical distributions stipulated to by the parties, as shown in the footnote below, which show systematic underrepresentation of women in promotions and a loss of pay by women compared to men of almost $2000 per individual.[12] In addition to the statistical evidence, there also was evidence from various witnesses who testified as to specific acts of discrimination against them and other NARDAC employees.

The Special Master exhaustively considered the evidence with respect to each of the plaintiffs in these categories, and the Court finds that the Special Master's conclusions with respect thereto were not erroneous but clearly correct. The Navy's objection is accordingly rejected.

### B. Discrimination By Independent Naval Commands

Two points are made by the Navy with respect to discrimination by Navy commands other than NARDAC or NAVCOSSACT.

■ First. The Navy argues that the Special Master erred in ruling that plaintiffs who were discriminated against by a different Naval command prior to being employed by NARDAC or NAVCOSSACT may be entitled to relief in this action.[13] In support of that argument it is said that, because the relevant class is defined as certain employees of NARDAC or NAVCOSSACT, discriminatory practices by other Naval commands are outside the parameters of this case. That contention is not well taken.

42 U.S.C. § 2000e–16(c) directs that in Title VII actions against government employers, the "head of the department, agency, or unit, as appropriate, shall be the defendant." In the instant case, the action was brought against the Secretary of the Navy and the commanding officer of NARDAC, and through the years new Navy Secretaries and NARDAC heads were substituted as different individuals were appointed to these positions. It would make no sense to hold that in a suit against a defendant, *i.e.*, the Secretary of the Navy, discriminatory acts by some of his subordinates or agents may be considered but that those of other subordinates must be disregarded.

In line with these principles, this Court has treated the action throughout its long course through the courts as one against the Department of the Navy. Similarly,

---

**12.** The parties stipulated pretrial that during the period from 1970 through 1973, approximately 91.7 percent of the promotions at the GS–13 level and above went to males. One man but no women were promoted to GS–16 (100% males); men received eight of the nine promotions at the GS–15 level (89% males); twenty-four men and four women were promoted to GS–14 (86% males); and at the GS–13 level, there were thirty-six promotions with only two going to women (94% males).

New hires followed the same pattern. During the period from 1970 through 1973, 90% of the new hires at the GS–9 level and above were males. One man and no women were hired at the GS–14 level (100% males); twenty men and no women were hired at the GS–13 level (100% males); eighteen men and one woman were hired at the GS–12 level (95% males); twenty-three men and three women were hired at the GS–11 level (88% males).

An EEOC investigation of the *Trout* class action complaint established that the average

grade level for women above GS–7 was GS–10.738 and for men GS–12.179. This difference in grade level represents an annual difference in compensation between men and women of $1,960.00. For the period from fiscal 1971 through fiscal 1974, the average grade at NAVCOSSACT for men was GS–12.23 and the average grade for women was GS–9.25.

**13.** The Navy makes this argument against five claimants: Patricia Boyd, Helen Miner, Susan (Logue) Russell, Andrea Wallace, and Ellen S. Davis. Summary judgment was granted by the Special Master in favor of Ms. Miner and Ms. Russell. In the other three cases, the Special Master found that evidentiary questions required individualized hearings, but before these hearings could be held, the Navy chose not to contest the individual cases. Thus, the objection needs to be considered here specifically only as it relates to Ms. Miner and Ms. Russell.

when the Court of Appeals reviewed this case, it held that defendant could not be held liable "for the employment practices of other agencies over which it had no control." *Trout v. Lehman, supra,* 702 F.2d at 1105. The "other agencies" specifically named were the Civil Service Commission and the Office of Personnel Management, and there was no suggestion that this exception applied also to other subordinate Navy commands.[14] In short, it is clear that discrimination by sub-agencies of the Department of the Navy may appropriately be a basis for liability.

■ Second. In a related argument, the Navy asserts that because the class encompasses only employees of NARDAC or NAVCOSSACT, plaintiffs' allegations and proof must be limited to these two units or the class is enlarged and the commonality requirement is destroyed. Both the premise and the argument itself are mistaken.

Plaintiffs Miner and Russell, both members of the class, alleged discrimination at the hiring stage by another unit within the Department of the Navy, the Naval Materiel Command Support Activity (NMCSA). The discrimination was perpetrated at NARDAC when they were not promoted to a level consonant with their experience. It was on that basis that these individual plaintiffs, in common with the other members of the class, alleged discrimination, and it is on that basis that their allegations did not enlarge the class or destroy commonality. The Special Master's consideration of claims by Ms. Miner and Ms. Russell was therefore proper.

### C. Career Ladder Promotions

The Special Master granted summary judgment in favor of four plaintiffs[15] who were in line for but did not receive "career ladder" promotions. With respect to these cases, the Navy argues that, because these promotions were discretionary rather than automatic, the failure to promote could not be discriminatory. This argument is entirely without merit.

■ First. In a Title VII suit it is not decisive whether particular promotions were discretionary or automatic; what is critical is whether the promotions were awarded in a discriminatory matter. The law books are filled with decisions of discrimination in employment where the particular act of the employer was discretionary. *Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); *Ibrahim v. New York State Dept. of Health,* 904 F.2d 161 (2d Cir.1990); *Tye v. Bd. of Education,* 811 F.2d 315 (6th Cir.1987); *Maddox v. Claytor,* 764 F.2d 1539 (11th Cir.1985); *Carpenter v. Stephen F. Austin State Univ.,* 706 F.2d 608 (5th Cir.1983). In fact, discrimination with respect to employment actions which are otherwise discretionary is far more typical of Title VII violations than those over which the employer has no real control. To accept the Navy's argument would be likely to eliminate the vast bulk of discriminatory decisionmaking from the ambit of Title VII.

■ Second. The four claimants met their burden with respect to discrimination. The issue of discrimination is factual. Once a plaintiff has made out a proof of a claim that satisfies her initial burden, the defendant must provide clear and convincing evidence to rebut that showing. *See International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 359, 97 S.Ct. at 1866; *Stewart v. General Motors Corp.,* 542 F.2d 445, 453 (7th Cir.1976). The Navy did not rebut the claimants' showings here; in fact, it has not asserted that there was anything in these claimants' personnel records that would justify the denial of their career ladder promotions.

Ms. Fields was at the GS–7 level for twenty-three months, while the average wait in grade for men at that level was 13.7 months. The Navy offered no evidence of legitimate reasons for the disparity or indeed any explanation other than the "discretionary" legal argument noted above.

---

**14.** In light of section 2000e–16(c), a reference to "other agencies" could only be those agencies of which the Secretary of the Navy is not the head.

**15.** Lorene Fields, Patricia Fox, Caroline Kratz, and Catherine Quade (Miller).

As concerns Ms. Fox, the Navy claimed that no promotions were available during the relevant time frame. However, the Special Master found to the contrary that a large number of such promotions were available at all other times, both before and after Ms. Fox's eligibility, and that there was no evidence providing an explanation as to why promotions dried up precisely at the time that Ms. Fox was eligible. The Special Master accordingly found that the Navy had failed to rebut the claimant's initial proof with clear and convincing evidence. That factual finding is fully supported by the evidence, and the Special Master's decision will accordingly be affirmed.

In the case of Ms. Kratz, it took twenty-one months for her to become a GS–11, while during that entire period *all of the men who were doing the same work* were at GS–12. Here again, the Navy has not explained the delay, or why Ms. Kratz was in a lower grade at all. The Special Master, the trier of the facts, could appropriately find that the Navy had discriminated against this plaintiff.

Ms. Quade (Miller) claims that, when she was hired at a GS–5 level although qualified to be a GS–7, she was promised a promotion within one year, but that this promotion was not forthcoming. The only answer provided by the Navy—one that, as indicated above, is insufficient—is that Ms. Quade had no *right* to a promotion. That answer would make sense only if one assumed that the right embodied in Title VII not to be discriminated against is no right at all.[16] That of course is erroneous.

The findings of the Special Master that these claimants met their initial burden and that the Navy failed to rebut their proofs with clear and convincing evidence are not clearly erroneous, and the Navy objections will accordingly be rejected.

### D. Whitten Amendment and Pre–Act Conduct

The Navy next objects to the Special Master's consideration of the Whitten Amendment [17] as a defense to the claim of Danise Owens and of pre-Act conduct with respect to the claims of Helene Reveley and Sharon Woods.

In response to Ms. Owens' claim that her promotion was discriminatorily delayed, the Navy counters that the delay was justified by the Whitten Amendment which specifies that a promotion must be preceded by one year of service at the next lower grade level. The Special Master found factual ambiguities surrounding the length of Ms. Owens' service and the timing of her eligibility for promotion, and he ordered an individual hearing on the matter. Similarly, the Special Master ordered individual hearings for the claims of Ms. Reveley and Ms. Woods, again due to factual ambiguities.

Regardless of whether the Navy's position is legally viable, the Special Master first had to establish whether the factual premises of the Navy's arguments were correct, for on their face the claims submitted by these three plaintiffs indicated discriminatory treatment. It was because the facts were disputed and unclear that the Special Master ordered individual hearings at which the Navy could have established the factual predicates for its Whitten Amendment and pre-Act-conduct arguments. The Navy chose, however, not to contest any of the claims scheduled for individual hearings, including those of Owens, Reveley, and Woods. The Navy cannot now resurrect its arguments, having previously decided to forego the opportunity to make out a factual case regarding the claims. The Navy's objections are, accordingly, denied.

---

**16.** The plaintiff also had the right not to have the express promise unfulfilled for no reason at all, raising a further inference that sex discrimination was the real reason. Under the circumstances, failure to make good on the promise, without explanation, could properly be regarded by the finder of fact as evidence of discrimination.

**17.** Supplemental Appropriation Act, 1952. Pub.L. No. 82–253, § 1310(c), 65 Stat. 758 (1951); *see* 5 C.F.R. § 300.602 (1982).

### E. Failure of Claimant to Apply for Upward–Mobility Program

■ The Navy objects next to the Special Master's finding in favor of plaintiff Rosie B. Hopkins. The Special Master concluded that, under the then-existing upward mobility program, it was not necessary for Ms. Hopkins to have applied for a promotion, while the Navy asserts that her failure to apply is fatal to her claim. The Navy is mistaken.

First, this Court has already ruled that plaintiffs need not have actually applied for promotions in order to be entitled to relief, *Trout v. Hidalgo*, 31 FEP Cas. 281, 283 n. 4, 1981 WL 416 (D.D.C.1981), *citing Teamsters*, and that ruling, never overturned on appeal, is the law of the case. As with respect to a number of other issues discussed herein, *see* Section VI–A, *infra*, Department of Justice counsel have sought to ignore the rulings previously made in this case, erroneously appearing to regard the hearings on the entitlement of the individual class members as an opportunity to relitigate the broad legal issues that were put to rest for purposes of this case when they were decided in the context of the litigation regarding the class.

Second, and in any event, the Special Master found that there was a fixed schedule of promotions in the upward mobility program, and that under that program Ms. Hopkins did not need to apply for promotions to receive them. In response, the Navy simply asserts that Ms. Hopkins was not in the program and that she was required to apply for a promotion. That flat assertion is not enough to overcome either the doctrine of the law of the case nor does it establish that the Special Master's factual determination was clearly erroneous. The Special Master's finding is not erroneous but correct.

### F. Defense of Lack of Vacancy for Promotion

■ The Navy contends next that the Special Master erred in calculating backpay relief for each successful plaintiff as if she had received the promotions she did not receive because of the discrimination,[18] arguing that not every claimant would have actually been so promoted. According to the Navy, because the number of claimants is greater than the number of promotions, the Special Master should have established a retroactive quota on promotions, that is, all the claimants should have divided, pro rata, the monetary value of a fixed number of promotions. One of the difficulties with that argument is that the Navy has not proffered the actual number of available promotions, and it is not possible to determine that number. The Navy's solution—that the Court should simply assume a number and proceed from there—is too clever by half.

First. The Court has previously rejected quotas in the context of this case. In their initial request for relief, the plaintiffs asked the Court to impose a quota system on NARDAC for all future promotions, but the Court rejected that request. *Trout v. Hidalgo, supra,* 31 FEP Cas. at 285. Having rejected a future quota system, it would be incongruous now to impose a retroactive quota system.

Second. The issue before the Court is not which members of the class were or were not entitled to particular promotions, but what amount of backpay is to be awarded to the individual class members. The Navy seeks once again to ignore the determination long ago made in this case that, liability having been established, relief was to be awarded under a "representative earnings" formula, *Trout v. Hidalgo, supra,* 31 FEP Cas. at 283, which bases recovery upon the earnings of a group of employees not injured by the discrimina-

---

18. The government states that it makes this objection against 33 plaintiffs. However, it identifies only the following 29 claimants: Susan Alf, Dorothy Amendolair, Othelia Ashley, Margaret Bassford, Judy Bedell, Margaret Bents, Patricia Boyd, Nancy Brown, Carole Clum, Ellen Davis, Anne Eakin, Mary Ann Englebert, Frances Fiorillo, Barbara Gibson, Katherine Heberg, Marilyn Herrington, Essie Horton, Linda Jackson, Donna Johnson, Rose Kim, Flora Malterud, Janice Mengel, Helen Miner, Clara Perlingiero, Helene Reveley, Lucretia Robinson, Kay Rouse, Andrea Wallace, and Sharon K. Woods.

tion, comparable to plaintiffs in ability, size, and length of employment. *Id.* This decision settled as the law of the case the substantive issue that the Navy seems determined to relitigate.

Third. Irrespective of these legal obstacles to the government's position, there is the basic fact that the Navy has failed to offer persuasive evidence that only certain promotions were or would have been available. To accept the Navy's scheme, therefore, the Court would have to engage in hypothetically assuming a fixed number of vacancies in the various grades by a mathematically imposed quota, without evidence that such a fixed maximum existed. That the Court declines to do.

The law is that ambiguities in Title VII cases are to be resolved against the proven discriminator, *Day v. Mathews,* 530 F.2d 1083, 1086 (D.C.Cir.1976); *McKenzie v. Sawyer,* 684 F.2d 62, 77 (D.C.Cir.1982); *Segar v. Smith,* 738 F.2d 1249, 1291 (D.C.Cir.1984), on the common sense basis that such ambiguities are the product of the very system of discrimination the defendant created.[19] Accordingly, once discrimination has been shown, relief should not be artificially narrowed, *id.* 530 F.2d at 1086; *see also, Milton v. Weinberger,* 696 F.2d 94, 99 n. 14 (D.C.Cir.1982), because to do so would have the perverse effect of allowing the discriminator to benefit from the complex web of illegality that it created and for which it is liable.

In implementation of these basic principles, courts have held that complete relief for the members of a group of individuals who have demonstrated discriminatory

treatment may be awarded where it is impossible for the court to determine which particular claimant, absent discrimination, would have received what promotion without falling "into 'a quagmire of hypothetical judgments.'" *Dougherty v. Barry,* 869 F.2d 605, 614 n. 8 (D.C.Cir.1989), *citing Segar v. Smith, supra,* 738 F.2d at 1290. This "quagmire of hypotheticals" could of course be safely circumnavigated if the Navy came forward with evidence that certain claimants would not have been promoted, even absent discrimination, based on legitimate factors. *See International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 361–62, 97 S.Ct. at 1867–68. However, the Navy has failed to come forward with such evidence.

The Navy cites the *Dougherty* case to the contrary;[20] but that decision does not support the Navy's position. In that case, eight white fire-fighters charged that the District of Columbia had discriminated against them on the basis of race when two black fire-fighters were promoted to the position of deputy fire chief. The Court of Appeals ruled that it was improper to award backpay to each claimant as if each had received the promotion, and it therefore ordered a *pro rata* scheme. The critical difference between that case and this is that in *Dougherty* it was clear that only two of the claimants would and could have been promoted, while here no definite number of promotions has been either suggested or established.

Where an entire system is infected with discrimination over time, a fixed number of promotions cannot normally be identified

---

**19.** Indeed, the Court has both the power and the duty to fashion complete relief to deal with that system. *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *United States v. Paradise,* 480 U.S. 149, 183, 107 S.Ct. 1053, 1072, 94 L.Ed.2d 203 (1987).

**20.** The Navy also relies on *Milton v. Weinberger,* 696 F.2d 94 (D.C.Cir.1982), for the proposition that the nonavailability of vacancies constitutes a valid defense. However, not only did the *Milton* court discuss *Day v. Mathews,* 530 F.2d 1083 (D.C.Cir.1976), in the context of but two vacancies, but it went on to state:

Nothing in the aforecited "example" is intended to suggest that the employee who is denied

the promotion should also be denied back pay, seniority credit, attorney's fees, costs, equitable relief, or the like, where any such relief is otherwise found to be appropriate. Under *Day v. Mathews,* the defendant—a proven or admitted discriminator—bears a very high burden of proving that relief should not issue despite the finding of discrimination. As was made clear in *Day:* "[I]t is only equitable that any resulting uncertainty [as to relief] be resolved against the party whose action gave rise to the problem. Thus, once discrimination is shown, relief should not be narrowly denied." 530 F.2d at 1086.

696 F.2d at 99 n. 14.

as it could be in the straight-forward facts of *Dougherty*. Accordingly, in cases in which the class is sizable and the discrimination is systemic, the employment history of the agency or entity cannot be replayed with the discrimination edited out. *See Pettway v. American Cast Iron Pipe Co., supra,* 494 F.2d 211. As the Fifth Circuit said in that case, "[T]he method of computation will be a function of the complexity of the case." *Id.* at 261. Where the class is small, the time frame short, or the effect of the discrimination straightforward, the court can make a "fairly precise determination" of each claimant's entitlement to relief. *Id.* But that is not the way to proceed in a case such as this, where

> [t]here is no way of determining which jobs the class members would have bid on and have obtained if discriminatory testing, seniority, posting and bidding system, and apprentice and on-the-job training programs had not been in existence. Class members outnumber promotion vacancies ... This process creates a quagmire of hypothetical judgments.

494 F.2d at 260.

It is on such a basis that this Court concluded in this case in 1981 that a fixed quota system is to be avoided when "due to the 'class size or the ambiguity of promotion or hiring practices or the multiple effects of discriminatory practices or the illegal practices continu[ing] over an extended period of time.'" *Trout v. Hidalgo, supra,* 31 FEP Cas. at 283, *citing Pettway, supra.* The Court reaffirms its 1981 decision which the Navy and Justice counsel would, once again, have it ignore.

### G. Failure of Certain Claimants to Satisfy Their Initial Burden

 The Navy argues that the Special Master erred in referring nine claims to a hearing where the plaintiffs allegedly did not satisfy their "initial burden," *see Inter-*

*national Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 361–62, 97 S.Ct. at 1867–68. The Special Master found that with respect to these particular plaintiffs [21] the proof of claim forms did not satisfy their initial burden, but that there were sufficient facts in the record apart from the forms to suggest that the plaintiffs were victims of discrimination and could meet their initial burden of proof. To clarify the factual situation, the Special Master ordered an evidentiary hearing to determine whether the plaintiffs could meet their burden in these cases.

The Navy moved for summary judgment against these claimants. The Special Master denied the motion, finding that (1) there were facts to suggest that, upon further hearing, the plaintiffs could meet their special burden, and (2) the Navy had not rebutted the charges of discrimination with clear and convincing evidence of legitimate reasons for its employment practices. *Id.* at 69. The Navy argues that the burden of providing clear and convincing evidence did not shift to it until plaintiffs had first met their initial burden. *See Stewart v. General Motors Corp., supra,* 542 F.2d at 451.

The Navy is correct in that, as a matter of law, a defendant's burden of proof is not triggered until the plaintiff has met her initial burden. But this rule does not defeat plaintiffs' claims here for, as the Special Master found, there were facts in the record outside the proof of claim forms themselves suggesting that they could meet their burden of proof.[22] There is of course no requirement that plaintiffs' burden must be met by certain forms alone, which are merely an administrative convenience, and the Special Master's finding was therefore entirely correct. But even if it be assumed *arguendo,* that the Special Master was in error in that finding, the error was harmless, for the Navy conceded all of the cases for which a hearing was to

---

**21.** The nine claimants at issue in this objection are Lavon Boisen, Anne W. Eakin, Shirley E. Harris, Donna H. Johnson, Pearl M. Jones, Vernice Lee, Thelda Y. MacMillan, M. Frances Miles, and Bernice Nelson.

**22.** Where there were no such facts, *e.g.,* with respect to Jean M. Bolen, Kathryn J. Grubmayer, Ann C. Johnson, Julie L. Johnson, the Navy's motion for summary judgment was granted and properly so. Special Master Memorandum at 55, 58, 60, 62.

be held (*see* note 9, *supra*), and the objection is therefore moot.

## III

### *Objections of Plaintiffs Trout and Hardy*

The Special Master denied the claims of Yvonne Trout and Charlene Hardy on the basis of a prior determination by this Court that they were not victims of discrimination, and he also denied the claim of Joan Walsh Creighton on the basis of a prior judicial determination that she was not a member of the plaintiff class. These plaintiffs object to the preclusion of these claims.

Trout and Hardy argue (1) that they have new claims, in particular a claim relating to pay differentials, that were not considered by the Court in 1981, and (2) that although their individual claims were denied, they are entitled to relief *qua* class members independent of the status of their individual claims. The Court rejects both arguments.

 First. The initial finding of class-wide discrimination dealt with discrimination by the Navy in "hiring, performance evaluation, job assignment, promotion, and award procedures." *Trout v. Hidalgo, supra,* 517 F.Supp. at 877. If Trout and Hardy have viable claims as class members, these claims cannot be distinct from those of the class; their claims *qua* class members must be the same as those of the class. They cannot, as class members, have new claims.

In addition, contrary to plaintiffs' contention, issues of pay discrimination are not new, but were, in fact, considered by the Court. In making out their initial burden of proof as to discrimination, plaintiff's own expert, Dr. Mahlon R. Straszheim, began his analysis of the Navy's practices by focusing on salary differentials. *Trout v. Hidalgo, supra,* 517 F.Supp. at 878. On these bases, the Court rejects the argu-

ment that there is a new issue regarding pay discrimination.

 Second. The argument that Trout and Hardy have a right, as class members, to benefit from the Court's finding of class-wide discrimination notwithstanding the denial of their individual claims raises issues that are more complex. During the original trial, the Court considered both evidence regarding class-wide discrimination and evidence in support of and in opposition to claims of discrimination made by specific individuals.[23] Eventually, in its 1981 ruling, the Court found that the class plaintiffs had met their burden of showing class-wide discrimination on the basis of sex, but at the same time it concluded that no such showing had been made in support of the individual claims of Trout, Hardy, and Creighton,[24] and it dismissed those claims.

Trout and Hardy argued unsuccessfully before the Special Master, and they argue again here, that despite those dismissals they are entitled to the same benefits that the other class members enjoy in terms of a presumption of discrimination. That argument must be viewed in the procedural context of this case.

The Court adopted the bifurcated approach common to class actions such as this. At the first stage, plaintiffs must show that the employer engaged in illegal discriminatory practices. If the Court finds at that stage that the employer did that, it is presumed that hiring and promoting decisions were infected with discrimination, and the victims of this discrimination are entitled to a make-whole remedy. *See, e.g., Sledge v. J.P. Stevens & Co.,* 585 F.2d 625 (4th Cir.1978).

Unless the employer accepts the finding of discrimination (as it normally does), the individual members of the class must then satisfy the "initial burden" imposed by *International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 359, 97 S.Ct. at 1866, that is, she must show mem-

---

**23.** In addition to those of Trout and Hardy, these were the claims of B. Marie Bach, D. Clara Perlingiero, and E. Joan Creighton.

**24.** The Court did sustain the individual claims of Bach and Perlingiero.

bership in the relevant class, employment by the defendant during the critical time period, and the fact of discrimination as it applies to her individual case.

This leads to the second stage, in which the burden shifts to the employer to show, if it can, that there were legitimate reasons underlying the disputed employment practices. *See Stewart v. General Motors Corp., supra,* 542 F.2d at 453. If this burden is met, compensation is denied unless the plaintiff is able to demonstrate that the "legitimate" factor was a mere pretext for discrimination. *International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 359, 97 S.Ct. at 1866.

Trout and Hardy argue that it is unfair to dismiss their claims in the first stage of the litigation (when the burden was on the plaintiffs), while the claims of the other class members were decided during the second stage where they benefitted from a presumption of discrimination. That argument rests on a misunderstanding of the Court's rulings.

The critical fact, fatal to the arguments of Trout and Hardy, is that the Court considered their claims, too, in light of the finding of class-wide discrimination. Because the Court decided the class-wide liability issue at the same time that it decided the individual claims of Trout and Hardy, neither of these two individuals was deprived of the benefit that the unnamed plaintiffs enjoyed. At the first stage of this case, the Court engaged in extensive fact finding as to the claims of Trout and Hardy. In the case of Ms. Trout, the Court concluded that her lack of management skills and her abrasive personal style were responsible for her treatment by the Navy. *Trout v. Hidalgo, supra,* 517 F.Supp. at 888. As for Ms. Hardy, the Court found that her employment experience was the result of her job performance and not of discrimination. *Id.* at 890.

The Court did not ignore the finding of class-wide discrimination in making these individual determinations. In fact, the Court found in favor of Bach and Perlingiero, two other "named" plaintiffs, and it expressly noted that the Trout and Hardy claims were dismissed "notwithstanding its conclusion regarding the class." Accordingly, when the second stage of the case was assigned to the Special Master, the Court instructed the plaintiffs to submit claim forms, with the exception of Trout and Hardy, stating:

> With regard to Yvonne Trout and Charlene Hardy—both of whom are members of the class and both of whose private discrimination claims were denied—any submission of a notice and claim form would be futile, since the government has already shown at trial, and the Court has already found, that any adverse treatment of them was supported by reasons apart from sex discrimination.

*Trout v. Hidalgo, supra,* 31 FEP Cas. at 284 n. 8.

Plaintiffs rely upon the *Sledge* decision, *supra,* for the proposition that the dismissal of their individual claims is equivalent to an erroneous denial of relief to them as class members. But the appellate criticism in *Sledge* of the District Court's approach was that the individual claims there were dismissed "without taking into account the presumption in their favor resulting from its ruling that class discrimination existed." 585 F.2d at 637–38 n. 25.[25] However, to grant relief here would require that the Court "close its eyes ... to proof that a particular class member will not succeed in any subsequent quest for backpay." *Sledge v. J.P. Stevens & Co., supra,* 585 F.2d at 637–38 n. 25. The Court has already considered the claims and evidence of Trout and Hardy in tandem with that of the class as a whole and found it to be insufficient.

The Special Master was correct to deny the claims of Trout and Hardy on the basis

**25.** Other cases on which plaintiffs rely, such as *Lewis v. Bloomsburg Mills, Inc.,* 773 F.2d 561, 573 (4th Cir.1985); *Griffin v. Carlin,* 755 F.2d 1516 (11th Cir.1985); *Rossini v. Ogilvy & Mather, Inc.,* 798 F.2d 590 (2d Cir.1986); *Calloway v. Westinghouse Elec. Corp.,* 642 F.Supp. 663 (M.D.Ga.1986), involve dismissals of individual claims without regard to class-wide discrimination.

of the reasoning above (which amounts to a particular application of the doctrine of the law of the case).[26] *See* 18 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4478. Plaintiffs' objections are therefore overruled.

## IV

### Regression Analysis for Determining Appropriate Relief

The Court referred to the Special Master the issue of what form of regression analysis should be employed to determine plaintiffs' injuries and to calculate relief. Plaintiffs and the Navy presented regression analyses [27] that widely differed from each other, and the Special Master consequently held evidentiary hearings to examine the analyses and their respective methodologies more closely. On March 30, 1990, he issued a Memorandum and Order that included several conclusions about the analyses to be used, and he ordered the parties to perform regression analyses in accordance with these conclusions. March 30, 1990 Memorandum and Order of the Special Master at 44.

A second evidentiary hearing was held before the Special Master, beginning August 22, 1990, to permit the parties to submit into evidence expert testimony and reports prepared in response to the March 30 Memorandum. Following that hearing, the Special Master issued on December 27, 1990 a comprehensive Second Memorandum and Order on the Most Appropriate Form of Regression Analysis (Regression Memorandum II). In light of the evidence and counsels' arguments, the second Memorandum modified some earlier conclusions, made findings as to the form and method-

ology of the appropriate regression analysis, and computed plaintiffs' relief using the appropriate regression analysis.

The Navy has raised several objections to the findings of the Special Master concerning the appropriate form of regression analysis. It objects to the exclusion of the level of prior of work experience from the adopted regression analysis; the Special Master's rejection of the benchmark date of March 24, 1972; his credibility assessment of the government's expert; and his conclusions regarding the relationship between individual claims and the accuracy of the government's regression analysis.[28] The plaintiffs, on their part, object to the Special Master's ruling that pre-judgment interest shall be excluded from the relief award. All these objections are considered below, following a brief background discussion of the regression analysis itself.

### A. Background

Multiple regression analysis is a form of statistical analysis that measures the specific influence that independent variables have on what is referred to as a dependent variable such as salary level. *Segar v. Smith, supra,* 738 F.2d at 1261. In Title VII cases, the independent variables will generally be matters such as education level, experience, age, and race or gender. *Id.* The first step in a regression analysis is to identify the independent or explanatory variables, which are the factors thought to affect significantly the dependent variable. The regression analysis measures the impact of each potential independent variable on the dependent variable by holding all the other independent variables constant. This allows the analyst to determine how much of an observed disparity between the

---

**26.** The doctrine of the law of the case is also relevant to plaintiffs' objections to the denial of class-member status to E. Joan Creighton. In the 1981 consideration of this case, the Court considered two claims by Creighton, one as part of the class action (Civil Action Number 73–0055), and again separately as an individual claim (Civil Action Number 78–1206). The Court dismissed the individual claim, and as for the class action claim, the Court found that Creighton was not a member of the class. *Trout v. Hidalgo,* 517 F.Supp. 873, 891 n. 77 (D.D.C. 1981).

**27.** The parties agreed on the use of the tool of a regression analysis which is generally regarded as an excellent methodology for computing relief. K.J. Gilmartin, *Alternative Methods for Computing Formula Relief,* Report dated June 27, 1989 at 4.

**28.** The Navy also contests the Special Master's computation regarding the relief for Claire Chong. That objection is considered at Section IV–F, *infra.*

salaries of men and women, for example, can be attributed to sex, as opposed to the other independent or explanatory variables. The appropriateness of a variable is critical and "the choice of proper explanatory variables determines the validity of the regression analysis." *Id.*

In the instant case, the plaintiffs' expert, Dr. Mahlon R. Straszheim, produced salary regression analyses for each year for the period 1970–89, using pre-hire experience, education, and other variables measuring the productivity of the NARDAC employees. He also included a sex variable to test for differences attributable to sex differences independent of other variables. Special Master's Regression Memorandum II at 5. Dr. Straszheim determined that statistically significant sex differentials persisted through most of the period 1970 to 1989, and more specifically during the period from July 1970 to April 1979. The Navy's experts, principally Dr. Kevin J. Gilmartin, provided salary calculations utilizing variables for the amount and level of pre-hire experience for those entering NARDAC from all sectors (including private industry). These analyses cover the period from 1970–79; they exclude personnel actions that occurred after April 30, 1979; and they exclude the effects of personnel actions that occurred prior to March 24, 1972—a date referred to as the benchmark date. Dr. Gilmartin concluded that there were no significant sex differentials at NARDAC. The Special Master's Second Memorandum and Order, dated December 27, 1990, discusses in detail the methodology adopted by the two sets of experts. Second Memorandum at 7–18. The Court hereby adopts that discussion.

Application of the regression analyses was divided by the Special Master into two groups. The first group consists of the thirty-two claimants to whom he granted summary judgment. The second group is made up of the thirty-five claimants for whom individual evidentiary hearings were required.[29] As noted above, the Navy ultimately decided not to contest those claims.

There is a dramatic difference between the regression analyses submitted by the plaintiff and those proffered by the Navy. When plaintiffs' calculations are limited to actions through April 30, 1979,[30] the results of their analysis totals $428,712 in backpay for group one (the thirty-two claimants to whom summary judgment had been granted), while the Navy's estimate totals $30,940 for this group. For group two (the thirty-five claimants scheduled for the evidentiary hearings), plaintiffs calculate a total of $241,620, while the Navy contends that the proper total is $17,278. Thus, nearly $625,000 separates the parties' calculations. Regression Memorandum II at 6. The Special Master awarded the amounts calculated by plaintiffs' expert.[31] *Id.* at 57–59.

The Court will now consider the various factors that account for these startling differences and for the Special Master's decision.

### B. Exclusion of Level of Prior Work Experience

█ Regression analyses are typically challenged on the basis that one or more variables should be included or excluded because of their appropriateness or lack thereof. One basis for excluding a variable as "tainted" is that it gives a false explanation for the disparate impact. A prime example of tainted variables are "status variables," such as job rank or grade level, which could reflect, at least in part, prior discrimination. Baldus & Cole, *Statistical Proof of Discrimination* § 8.23 at 112–13 (1987 Supp.). If, for example, an individual's grade level is itself based on discrimination, then use of grade level as a variable would falsely suggest that disparities in

---

**29.** As indicated at p. 1401, *supra,* the Special Master denied relief to 16 claimants, and dismissed 10 others because the claimants had opted out of the class.

**30.** The Special Master used the period of July 1, 1970 through April 30, 1979 as the relevant time frame, based upon this Court's prior findings on liability. *See Trout v. Webb, supra,* 708 F.Supp. at 358.

**31.** In the cases of Claire Chong and Carolyn Harwood, the awards were increased based on larger calculations by the Navy.

pay were attributable to an objective factor rather than to the real source, discrimination. In this Circuit, it is the law that a variable is to be excluded if it is not demonstrated by clear, affirmative evidence that it is based on neutral, objective factors, applied consistently. *Valentino v. United States Postal Service,* 674 F.2d 56, 72 n. 30 (D.C.Cir.1982); *cf. Sobel v. Yeshiva University,* 839 F.2d 18 (2d Cir.1988).

Both parties agree that the bulk of the disparity between their respective calculations is attributable to (1) the inclusion or exclusion of the claimants' level of pre-hire experience and (2) the use of the March 24, 1972 benchmark date.

■ On the first of these issues, the Special Master ruled, *inter alia,* that the use of a *level* of prior work experience in any sector cannot be accurately determined or is a tainted statistical proxy and must be excluded from the regression analysis. The Navy objects to this determination. This raises the issue of whether estimates of claimants' level of prior work experience constituted an objective, legitimate proxy for their qualifications and productivity at the time of hire, as the Navy argues, or whether it is tainted because it includes prior discrimination, as plaintiffs argued and as the Special Master found. As will now be seen, the Special Master's analysis is correct. *See, e.g., Valentino v. United States Postal Service, supra,* 674 F.2d at 72 n. 30; *James v. Stockham Valves & Fittings Co.,* 559 F.2d 310, 332 (5th Cir. 1977); *Rossini v. Ogilvy & Mather, Inc.,* 615 F.Supp. 1520, 1534–35 (S.D.N.Y.1985), *rev'd on other grounds,* 798 F.2d 590 (2d Cir.1986); Finkelstein, The Judicial Reception of Multiple Regression *Studies in Race and Sex Discrimination Cases,* 80 Col.L.Rev. 737, 742, 746 (1980).

The Navy used the following pre-hire "level" variables that are now at issue: (1) for hirees from the federal sector: prior grade level and step within grade; (2) for hirees from the military: prior rank; and (3) for hirees from the private sector: estimated equivalent GS grade of prior job.

At the hearing on those issues, plaintiffs' expert challenged the Navy's attempt to include the pre-hire level variable on the basis that each of these variables incorporates prior discrimination and should therefore be excluded. The Special Master concluded that this was correct, and in addition, he determined that the Navy's estimate of an equivalent GS rank for hirees from the private sector was inherently subjective.

The incorporation of an individual's prior salary or grade as an untainted proxy is effected on the implicit assumption that the salary or grade is an independent, objective measure of her qualifications at the time just prior to hiring.[32] However, there was no clear evidence in this case demonstrating that pre-hire level constituted an objective variable that was representative of pre-hire experience. To the contrary.

First, the evidence demonstrates that there was a continuing pattern of discrimination at which women employees were placed at levels below their experience. *See supra* note 12; *see also,* the discussion in *Trout v. Hidalgo, supra,* 517 F.Supp. at 877–80. Although discrimination prior to March 24, 1972 is not actionable, it does and may provide evidence that pre-hire levels were tainted with discrimination.

Second, this Court has already found pre-hire discrimination. *See id.* at 880. While the Court of Appeals ruled that pre-hire level could not be a basis for liability because NARDAC may not have been responsible for the discrimination, the appellate court did not reject the statistical evidence demonstrating discrimination in pre-hire level nor, more to the point here, did it reject this Court's factual finding that there was such discrimination. Regardless of whether that pre-hire discrimination occurred at the Navy or elsewhere, a pre-hire level variable that is tainted with discrimination is inappropriate.

**32.** The analysis then measures progress from that point forward: if men and women advanced equally from that point on, the disparity attributable to the sex of the individual (that is, the sex coefficient) would be zero.

In addition to this Court's specific finding of discrimination in pre-hire level, economic evidence was introduced that the use of a prior experience level imposed a twenty-one percent penalty on women.[33] Where there was discrimination during the prior work experience, so that women were paid less then men in equivalent positions, the use of pre-hire level permanently factored in the discriminatory disparity.[34]

The inclusion of pre-hire level also would have resulted in a statistical showing of virtually no sex discrimination. A conclusion in the relief proceedings that there was no discrimination attributable to sex would have been inconsistent with this Court's earlier finding during the liability phase that such discrimination existed. The incongruity suggests that the pre-hire level variable masks discrimination and is, therefore, tainted.[35]

The burden was on the Navy to prove by objective, affirmative evidence that the pre-hire salary variable was appropriate and not tainted by sexual factors. *Segar v. Smith, supra.*[36] However, the evidence demonstrates, as the Special Master found, that pre-hire level did not reflect the claimants' prior experience, but rather their prior exposure to sex discrimination.

There are obvious reasons why it would be useful to measure precisely the level or quality of prior experience; the problem in

this instance is that there was no objective way to do so. Even the Navy's expert, Dr. Gilmartin, conceded that "we have no objective way of determining a person's level of position except by using that person's salary."[37] It is presumably for that reason that the Court of Appeals in *Segar*, citing to its own earlier *Trout* opinion, noted that statistical analysis may depend on the quality and control of the available data. *Segar v. Smith, supra*, 738 F.2d at 1276.[38]

In response, the Navy argues that even if there was pre-hire discrimination against women, pre-hire level still accounts for the knowledge, skill, and abilities each claimant brought to NARDAC. This argument is specious. The claimants in this case are individuals who demonstrated that they had the same experience and qualifications as men at higher levels[39] but were not promoted to the same levels. The fact is that they were qualified to do, or were actually doing, the same work as men but were not paid as much as their male colleagues. It is therefore more likely than not that the grade or salary level at which these women entered did not fairly account for their experience and qualifications, and at a minimum the finder of facts could so conclude.

The Navy's argument to the contrary constitutes an attempt to have it both ways: it contends (1) that it did not discrim-

---

**33.** Plaintiffs' expert, Dr. Straszheim, also testified that as of 1977, for example, women who entered NARDAC were systematically paid $1,455 less than comparable men. For women coming out of the military, the differential with men was about $3,000.

**34.** Thus, if during the period prior to the time frame for the regression analysis, women were generally paid $3,000 less than men due to sex discrimination, use of the pre-hire level variable would credit women with $3,000 less experience of qualifications then men. Special Master's Regression Memorandum II at 26–27.

**35.** The ramifications of the Navy's argument are revealed by the testimony of its expert, Dr. Gilmartin, who offered the opinion that there was "no evidence of discrimination at initial hire," even though this Court had expressly found that such discrimination existed. Special Master's Regression Memorandum II at 28.

**36.** In addition, this burden must be viewed in the light of the principles of Title VII relief

which dictate that ambiguities are to be resolved against the discriminator, *Day v. Mathews, supra*, 530 F.2d at 1086, and relief should not be artificially narrowed, *Milton v. Weinberger, supra*, 696 F.2d at 99 n. 14.

**37.** Tr. of September 1989 hearing at 282.

**38.** The pre-hire experience level is actually an initial grade-at-hire variable in disguise, and this Court has already determined the intiial grade-at-hire to be a tainted variable. *Trout v. Hidalgo, supra*, 517 F.Supp. at 886 n. 47. The Navy's expert, Dr. Gilmartin, conceded in his testimony before the Special Master that "perhaps" this was so. Special Master's Regression Memorandum II at 27.

**39.** Curiously, the Navy has resisted including the college and graduate degrees in mathematics of various plaintiffs.

inate while the plaintiffs worked for it, and (2) that pre-hire discrimination should not be considered in the regression analysis. But since the evidence shows that the women were systematically paid less than equally qualified men, the question that presents itself is obvious—how did that disparity come about?

The fact that the Navy may not have been responsible for plaintiffs' prior (unduly low) level is not relevant when that level is to be used as a variable in the regression analysis at the relief stage. If the pre-hire experience variable is tainted by prior discrimination, its inclusion improperly incorporates that discrimination. *Valentino v. United States Postal Service, supra,* 674 F.2d at 72 n. 30. Although the Navy is not to be held accountable for discriminatory actions outside its province, neither can it, in the context of a Title VII lawsuit, benefit from such discrimination. Inclusion of discriminatory pre-level hire would essentially perpetuate the discrimination against women on a permanent basis even though they have been employed for years by the Navy, an agency of the United States government. The fact that a woman was graded or paid below her qualifications or experience level by a prior employer does not mean that the Navy, upon hiring the employee, may treat her forever after at the discriminatorily low level. There is no "shelter" principle in employment discrimination.

In *Bazemore v. Friday,* 478 U.S. 385, 397, 106 S.Ct. 3000, 3007, 92 L.Ed.2d 315 (1986), the Supreme Court held that an employer is liable for its failure to eliminate discrimination that originated prior to 1972. *Id.* at 397, 106 S.Ct. at 3007. "Each

week's paycheck that delivers less to a [woman] than a similarly situated [man] is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII." *Id.* at 395–96, 106 S.Ct. at 3006–07; *see Trout v. Lehman, supra,* 652 F.Supp. at 146. The Navy's attempted reduction of its liability to the extent that it is based on discrimination that existed at the time of initial employment would directly circumvent that principle.

For the reasons stated, the Court concludes that the Special Master was correct in determining that use of pre-hire level would have been an "inappropriate variable." *Valentino v. United States Postal Service, supra,* 674 F.2d at 73 n. 30.

The Navy's reliance on lower court decisions does not materially advance its position. To be sure, in *Coser v. Moore,* 587 F.Supp. 572 (E.D.N.Y.1983), *aff'd,* 739 F.2d 746 (2d Cir.1984), the District Court found the plaintiff's regression analysis deficient because it did not include a variable accounting for prior experience. *Id.* at 599. But *Coser* is not persuasive here both because it was superseded by *Bazemore* and because it is inconsistent with the law of this Circuit in *Valentino v. United States Postal Service, supra,* which rejected a regression analysis that included grade level as a variable without clear proof that it was a neutral, non-discriminatory variable.[40] *Valentino v. United States Postal Service, supra,* 674 F.2d at 73 n. 30.[41] *See also, Rossini v. Ogilvy & Mather, Inc.,* 615 F.Supp. 1520, 1534 (S.D.N.Y.1985), *rev'd on other grounds,* 798 F.2d 590 (2d Cir.1986).

**40.** The fact that the variable at issue in *Valentino* was current level, while that at issue in this case is pre-hire level, is inconsequential. *Valentino* instructs that where a variable may be infected with discrimination it should be excluded. *Valentino v. United States Postal Service,* 674 F.2d 56, 73 n. 30 (D.C.Cir.1982).

**41.** Further, in *Coser,* the class members were from a variety of occupational categories with varying qualifications, and failure to account for their backgrounds could skew the analysis. Accordingly, there must be a controlling variable for qualifications. But as the Court of Ap-

peals held in the instant case, no such problem exists here because the class is generally homogeneous in terms of experience. *Trout v. Lehman, supra,* 702 F.2d at 1103. That court also said that where the experience of the class is itself fairly uniform, there is no danger of statistical imprecision by excluding a variable representing experience. *Id.* Given the uniformity of the class and the specter of prior discrimination infecting the variable, the danger in this case is not exclusion, but inclusion of the variable in the analysis.

■ The Navy next objects to the Special Master's reliance, in part, on the high $R^2$ factor in the Navy's analysis.[42] The $R^2$ factor measures the degree to which a regression analysis, taken as a whole, explains the observed disparities in a dependent variable. *Segar v. Smith, supra,* 738 F.2d at 1261. While the $R^2$ factor is not normally regarded as a particularly significant statistic, when it is "unusually high" it may be a "red flag suggesting the regression model contains one or more tainted predictor variables." Special Master's Regression Memorandum II at 25 *citing* Baldus & Cole (1987 Supp.) at 108. The Navy contends that, notwithstanding this principle, each variable must be examined individually and cannot be dismissed on the general basis of the $R^2$ factor.

The problem with that argument is that the Special Master did precisely what the Navy urges: he did not base his finding on the $R^2$ figure alone; he merely identified the Navy's $R^2$ average as unusually high and then proceeded to examine more closely the pre-hire level variable, concluding, for reasons discussed above, that the variable was tainted.[43]

■ The Navy next objects to the Special Master's exclusion of pre-hire level as it relates specifically to those class members who entered NARDAC from the private sector.[44] The Special Master found that the level of pre-hire experience for NARDAC employees entering from the pri-

vate sector could not be accurately determined by comparing the claimants' SF–171 forms [45] against the Office of Personnel Management (OPM) classification standards, as the Navy had done. Special Master's Regression Memorandum II at 23. This finding, too, was entirely justified.

In *Segar, supra,* the Court of Appeals upheld the exclusion of a variable that accounted for pre-hire experience where the measure of the experience amounted to a subjective determination. *Segar v. Smith, supra,* 738 F.2d at 1276. The "specialized experience" in *Segar* that was found to be thus flawed measured "such intangibles as 'ingenuity,' 'resourcefulness,' 'ability to arrive at sound conclusions,' 'tact,' and 'discretion.'" *Id.* The Navy's experts in the instant case similarly applied the Civil Service classification standards to the experience of private sector entrants by including such factors as: knowledge required by the position, supervisory controls, guidelines, complexity, scope and effect, personal contacts, purpose of contacts, physical demands, and work environment. Special Master's Regression Memorandum II at 20.[46] There is no analytic difference with *Segar* with respect to the issue of subjectivity.

Finally, it is worthy of note that the *Segar* court permitted the exclusion of the pre-hire experience variable not only because it was subjective but also because it was unnecessary. In *Segar,* as in this

---

42. The $R^2$ figure for the Navy's regression analyses averaged .93, while plaintiffs' averaged .72. Special Master's Regression Memorandum II at 24.

43. The Navy's argument on this point, too, is somewhat contradictory. If it would have been improper for the Special Master to have rejected the Navy's analysis on the basis of the $R^2$, how is it that the Navy can plausibly assert that its analysis should be accepted on the basis of that its $R^2$ was higher and therefore more accurate? Defendants' Objections to the Special Master's Second Memorandum at 22 (January 14, 1990).

44. The Court finds that the Special Master's rationale for excluding the pre-hire level variable for *all* sectors supports its exclusion with regard also to the private sector. Nevertheless, because the Special Master analyzed the private sector entrants separately and the Navy objects

separately, the Court examines this issue separately as well.

45. These forms are the official personal qualification statements of applicants for employment.

46. The Navy also contends that its application of the classification standards to the claimants' SF–171 forms is no different from what the Civil Service Commission regularly did, and that a rejection of the classification is an indictment on the SF–171 system itself. This is incorrect. The Civil Service Commission is not a proven discriminator in this case; the defendants are. The Special Master did not, and this Court cannot, have confidence in the application of highly subjective standards by the Navy in this case. Whether the CSC (or its successor) may in other instances apply its classification standards without discrimination is irrelevant.

case, the background of the claimants was implicitly accounted for in plaintiffs' analysis because of the homogeneity of the group's experience. *Segar v. Smith, supra,* 738 F.2d at 1276–77.

The Court concludes that, given the likelihood that the variable is tainted and the lack of necessity for its inclusion, the Special Master properly excluded pre-hire level from the regression analysis he adopted.

## C. Rejection of the Benchmark Date of March 24, 1972

The other significant source of the disparity between the backpay calculations of the parties is the Navy's proposed use of a benchmark date, *i.e.*, March 24, 1972—a use the Special Master rejected.

A benchmark date creates a "pseudo hiring event" that treats all claimants, for statistical purposes, as if they were hired on that given day. One obvious problem with such a date is that, by its very nature, it accounts only for personnel actions from there on forward, excluding all actions occurring prior thereto. Thus, if a woman, due to discrimination, was placed at a grade level below her qualifications prior to March 24, 1972, but was promoted at the same rate as men after March 24, 1972, a regression analysis using that benchmark date would, contrary to fact, indicate that she was paid precisely as were the men in her organization. One extremely serious consequence of the use of the benchmark date would thus be to protect the Navy from ever eliminating the salary differences which existed as of March 24, 1972.

This is not a mere hypothetical. The Special Master's Memorandum compared the parties' regressions for 1972 as follows. Plaintiffs did not utilize the benchmark date, and they estimated a sex coefficient of $-.12$, indicating a twelve percent salary disparity between men and women. The Navy's figures, by contrast, which include the benchmark date, show a sex coefficient of $-.0053$, a figure that suggests that the salary disparity is roughly one-half of one

percent.[47] Put simply, use of the benchmark date essentially, and contrary to the reality of the situation, eliminates any disparity from the computation and hence also any trace of discrimination.

In its statistics, its arguments, and the testimony of its experts with respect to the benchmark issue, the Navy, once again exhibiting its will to relitigate again and again issues long settled, claims that there was virtually no disparity based on sex with respect to the salaries it paid its NARDAC employees. That contention is flatly contrary to this Court's findings ten years ago, which are the law of the case. The Navy cannot, in the guise of an analysis on the claims of individual members of the class, relitigate those findings. *See also,* Section VI–A, *infra.* This consideration alone would justify summary rejection of the benchmark argument. However, substantively, too, the Navy's statistics, and specifically its use of the benchmark date, are highly suspect.

The Navy's point is that, without the benchmark date, it would be held liable for discrimination that is not actionable under *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), and *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). However, as this Court said in 1981 and in 1986, "although discriminatory conduct which occurred solely prior to March 24, 1972 is not directly actionable in Title VII suits ... evidence of such conduct can in some circumstances support the inference that such discrimination continued." *Trout v. Lehman, supra,* 652 F.Supp. at 144, and *Trout v. Hidalgo, supra,* 517 F.Supp. at 879–80.

Even more to the point, the Supreme Court made it clear in *Bazemore v. Friday, supra,* that it is permissible to use pre–1972 data as some evidence of discrimination as well as to calculate backpay.[48] This case, like *Bazemore,* involves discrimination that originated before March 24, 1972

---

**47.** In addition, the Navy's R² figure for the regression analysis is .9936. The analysis purportedly accounts for 99.36% of the disparity in salaries.

**48.** In the context of the regression analysis in this case, pre–1972 was used, not for liability, but strictly for the evaluation of backpay relief.

and continued after that date. Use of the benchmark date would bury the original discrimination, leaving exposed only a seemingly equitable pattern of employment practices. Just as this Court looked beyond March 24, 1972 to infer subsequent discrimination, it must also look beyond that date to *remedy* subsequent discrimination. The Navy may or may not be responsible for employment practices before the benchmark date; but it is responsible for perpetuating their effects after that date. *Bazemore v. Friday, supra,* 478 U.S. at 397, 106 S.Ct. at 3007. The Navy's proposed use of the benchmark date was properly rejected by the Special Master.

### D. Credibility Assessment of the Government's Expert

■ The Special Master found that plaintiffs' expert Dr. Straszheim was more credible than the Navy's expert Dr. Gilmartin, Special Master's Regression Memorandum II at 46, and the Navy challenges that determination. Just as did the Special Master, the Court concludes that the Gilmartin testimony was incredible on its face.

Dr. Gilmartin's analysis was based on the explicit premise that NARDAC had been entirely free of discrimination. Special Master's Regression Memorandum II at 46. According to that expert witness, there should be no relief at all because "to my knowledge, there is no evidence that NARDAC discriminated against a protected group during the relevant time period." Tr. of August 1990 hearing at 282. Gilmartin made this astounding statement although, as acknowledged, he was "not involved at trial," Tr. at 383, and although

this Court expressly made a finding to the contrary.

Just as has been indicated above, throughout the proceedings before the Special Master, and its arguments here, the Navy and their Justice counsel flagrantly ignored the doctrine of the law of the case. These violations of legal rules that apply to all litigation were compounded when counsel presented a witness who proceeded likewise to flout that rule. It would not be going too far to characterize such conduct as contemptuous of the judicial process. *See also,* Section VI, *infra.* In any event, the Special Master quite properly observed that Dr. Gilmartin's judgment could not help "but be affected by his conclusion that there was no discrimination in this case." *Id.* at 47.[49]

Finally, given the superior vantage point of the Special Master as the trier of facts and the strength of the evidence supporting his finding, the Navy's objection to the credibility determination must be dismissed as frivolous. *See* Fed.R.Civ.P. 53(e); *Bostick v. Boorstin,* 617 F.2d 871 (D.C.Cir. 1980); *see also, Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) (even greater deference than usual where the fact finder's ruling is based on the credibility of witnesses).

### E. The Relationship of Six Individual Claims to the Accuracy of the Regression Analysis

■ While a wide disparity exists in general between the calculations of the Navy and those of the plaintiffs, it is particularly marked in six individual cases.[50] In these six cases, the Navy's analysis

---

**49.** The Navy argues that Dr. Gilmartin was credible because he claimed there was no pattern of discrimination *after* March 24, 1972. But this narrowing, hedging, and explaining of the expert's testimony does not make him any more credible; in fact, it makes him less so.

The Navy also complains that the Special Master mistakenly assumed that Dr. Gilmartin was biased. If the Special Master had made such an assumption, it would not invalidate his findings, for some experts, like other witnesses, are biased, and the fact-finder has the right, if not the obligation, to make assessments of that kind. But, in fact, the Special Master rejected

the plaintiffs' charge of bias. The Special Master only said that "the fact that since 1984 [Dr. Gilmartin's organization] has been paid approximately $1,800,000.00 for expert witness fees in the *Trout* case ... reflects more on the intransigence of the defendants in ignoring the economic value of this case than it does to the credibility of Dr. Gilmartin." Special Master's Regression Memorandum II at 47.

**50.** Those individual plaintiffs are: Anna L. Bradford, Shirley E. Harris, Bernise W. Nelson, Catherine E. (Miller) Quade, Susan K. (George) Russell, and Brenda J. Weaver.

achieved the result that each claimant was owed on the average only about fifty dollars in relief for the entire period of discrimination, while the analysis of plaintiffs' expert amounted to an average per claimant of around fifteen hundred dollars in backpay.[51] The extreme variations in the experts' calculations prompted the Special Master to request that the parties answer detailed questions regarding several illustrative claims. Special Master's Regression Memorandum II at 49. The Navy claims that it was error for the Special Master to examine the six claims and to refer to them in his Memorandum.[52]

Here again, the Navy and its Justice counsel, in a manifestation of the extraordinary zeal they have displayed throughout this case, complain about a matter of methodology which is plainly within the factfinder's discretion. The Special Master's examination served to assess what variables might have been responsible for the marked disparities between the conclusions of the various experts, and whether particular variables were properly included or excluded in the regression analysis. When one party argues that a particular claimant is owed $2,080.90 in backpay and the other calculates an award of $9.00,[53] a more detailed examination of the parties' process is not only warranted but may well be required.[54]

The Navy's objections to a detailed examination of the facts underlying some of the claims are rejected.

### F. Use of the NRFC Formula

As discussed in detail *infra*, the Navy did not in March 1989 contest the claims of five of the plaintiffs.[55] The ramifications of that concession are discussed in Section VI–C of this Opinion. Here, the Court will examine only the dispute regarding the correct computation of the five awards.

The Navy argues that if it must pay these claimants, the relief should be calculated according to the regression formula ultimately adopted by the Special Master, and not that of the Navy Regional Finance Center (NRFC). The Special Master's decision to utilize the NRFC computation came about as follows. When the Navy conceded these five cases, it stated that a regression calculation would not be necessary because relief could simply be calculated by the NRFC. Defendants' Responses to the Class Members Proof of Claim Forms at 1 (March 22, 1989). The Special Master acquiesced because he was apparently concerned that in these uncontested cases use of the regression analysis—the shape of which had not yet been decided—would further delay relief in what were, by then, prolonged proceedings. As it turned out, and as anyone studying the record in this case could have predicted, the government's [56] continuing dilatory tactics delayed adoption of a regression formulas and hence further relief.

Subsequently, when the regression analysis itself finally became available to him, the Special Master reversed himself in

---

**51.** Plaintiffs' expert would have yielded relief amounting to $9,153.50; for the six claimants, the Navy's total is $309.00.

**52.** The Navy argues that it is "illogical" for the Special Master to justify his rejection of the government's analyses through reference to the six individual claims because the regression analyses at issue are generalized calculations. Individual claims, the Navy argues, provide no meaningful explanation about the regression analysis. Defendants' Objections to the Special Master's Memorandum at 49.

**53.** This refers to the claim of Susan K. (George) Russell.

**54.** Examination of the six claims appears to be exactly the sort of variable-by-variable dissection that the Navy itself demands in one of its

other objections. When the Navy objects to the Special Master's use of the $R^2$ factor as being too generalized, it argues that a determination on the appropriateness of a variable must be made on a variable-by-variable basis. Defendants' Objections to the Special Master's Second Memorandum at 22.

**55.** Those plaintiffs are Marie M. (Lassiter) Broughton, Claire C. Chong, Carolyn M. Harwood, Faye B. Tolliver, and Carole A. Velvin.

**56.** It is not always possible to determine whether particular dilatory or other improper tactics were the fault of the Navy or of Justice counsel. Where that is so, the Court sometimes makes reference to "the government."

three of the five cases where the amount calculated by the regression analysis was greater than the NRFC calculation, and Marie Lassiter Broughton, Faye Tolliver, and Carole Velvin were ordered to be awarded amounts calculated according to the regression analysis adopted by the Special Master. As for the two remaining claimants, Carolyn Harwood and Claire Chong, the Special Master decided that he did not wish to deny them the NRFC award which was larger in their cases than the regression award would have been.

Presumably because it now advocates the use of the regression analysis in the first place, the Navy does not challenge the use of the regression figures in the cases of Broughton, Tolliver and Velvin. As for Harwood and Chong, it challenges the use of the NRFC figures only with respect to Chong.

 The Court affirms the Special Master's rulings with respect to Broughton, Tolliver, and Velvin, in that their recovery was properly calculated in accordance with the regression analysis applied to the other claimants. However, as to Carolyn M. Harwood and Claire C. Chong, notwithstanding general principles,[57] the Court will reverse the Special Master's determination. These plaintiffs cannot, consistently with the law, be awarded relief in accordance with the NRFC calculations merely because the monies involved are larger than they would be if they were calculated under the regression analysis. The regression analysis was the proper tool for the relief computations as to the class generally and therefore as to Ms. Harwood and Ms. Chong in particular. The relief will accordingly be computed based on the regression analysis.

---

57. The law is that relief should make the claimant whole by putting her, as near as possible, where she would be had there been no discrimination, *Johnson v. Brock*, 810 F.2d 219, 223–224 (D.C.Cir.1987) (citations omitted), and that, in attempting to remedy the discrimination, the court should err on the side of relief rather than denial of relief because the employer, as a proven discriminator must bear that risk of error. *See Stewart v. General Motors Corp.*, 542 F.2d 445, 452–53 (7th Cir.1976).

---

## V

### *Plaintiff's Objection to the Denial of Pre–Judgment Interest*

 Plaintiffs' request for an award of pre-judgment interest was denied by the Special Master, based upon the ruling of the Court of Appeals in *Brown v. Secretary of Army*, 918 F.2d 214 (D.C.Cir.1990). In that case, the court ruled that while successful Title VII litigants are generally entitled to pre-judgment interest through the effect of the Back Pay Act, 5 U.S.C. § 5596, that Act does not extend to the discriminatory denial of promotions.

Since in the instant case, plaintiffs' request was for pre-judgment interest for the discriminatory denial of promotions, the Special Master denied the request pursuant to the holding of *Brown*. Special Master's Regression Memorandum II at 45. That was clearly correct, and plaintiffs' objection is overruled.[58]

## VI

### *Conduct of the Navy and Its Justice Counsel*

"The Government Wins Its Point When Justice is Done in its Courts"

Former Solicitor General Frederick William Lehmann so stated,[59] and his words have since echoed through time as an expression of the highest traditions of the Department of Justice. It is undoubtedly because the Lehmann saying so aptly captures the spirit of the Constitution and the importance of fair play when government is dealing with citizens, that this saying is now carved above the entrance to the Office of the

---

58. Plaintiffs have made no effort to distinguish this case from *Brown,* and they apparently object only in order to preserve the issue in the event that the holding in *Brown* is reversed. Plaintiffs' Motion to Appeal Denial of Prejudgment Interest on Backpay at 1.

59. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963).

Attorney General of the United States.[60] Upon contemplating the recitation of events described below, however, it is difficult to escape the conclusion that those who have been conducting the litigation in this case on behalf of the government have been operating on the converse of the Lehmann premise: their view appears to be that justice is done in the courts when the government wins its point. The Court now turns to that topic.

### A. Delays and Relitigation

As the Court has repeatedly observed, the government has sought to prolong this litigation by every means possible, both fair and foul. It is the Court's hope that the decisions made herein will finally conclude a case that in duration may make Charles Dickens' *Jarndyce v. Jarndyce*[61] look like a summary judgment proceeding.

Nearly twenty years have gone by since this action was initiated. While a vigorous and detailed defense of policy positions in the courts is of course entirely legitimate, the Navy's actions, supported by Justice counsel, have here gone beyond normal bounds. As an example: although the Court ruled a number of years ago that this class of women working for the Navy had been discriminated against on account of sex, *the Navy has insisted on relitigating every single individual claim* as if there had never been such a finding in favor of the class.[62] While a finding of discrimination in favor of the class is not ipso facto binding with respect to every class member, it is an affront to that finding to relitigate the discrimination issue with regard to every one of the members of the class.

These events have of course subjected the women who were discriminated against to recurring and unnecessary strain.[63] Such litigation tactics are inappropriate in any context, but the studied refusal to follow many unreversed rulings of the Court and the insistence on regarding them as non-existent may fairly be characterized as contemptuous of the judicial process. The Court of Appeals itself observed with respect to this case over eight years ago:

---

**60.** The carved inscription differs slightly from the Lehmann quote, viz., "The United States wins its point whenever justice is done its citizens in the courts." *See Withers v. United States,* 602 F.2d 124, 127 (6th Cir.1979); *United States v. Mele,* 462 F.2d 918, 926 (2d Cir.1972).

**61.** "Jarndyce and Jarndyce drones on. This scarecrow of a suit has, in the course of time, become so complicated that no man alive knows what it means ... innumerable children have been borne into the cause ... innumerable old people have died out of it. Scores of persons have deliriously found themselves made parties in Jarndyce and Jarndyce without knowing how or why; whole families have inherited legendary hatreds with the suit ... There are not three Jarndyces left upon the earth, ... but Jarndyce and Jarndyce still drags its dreary length before the court." C. Dickens *Bleak House* 12–13 (1853).

**62.** Indeed, even the government's experts premised their regression analysis on the notion that this discrimination, which had been found by the Court, did not exist. *See* p. 1418, *supra.*

**63.** The lengths to which the Navy has been willing to go are illustrated by the experience of plaintiff Lucretia Robinson. Ms. Robinson was hired by NAVCOSSACT in 1965 as a mathema-

tician. In 1972, Ms. Robinson filed an EEO complaint regarding the Navy's failure to promote her to GS–13, and in 1974, District Judge June Green ordered the Navy to promote her retroactively to GS–13, effective August 11, 1972.

The Navy appealed the decision, and the Court of Appeals remanded the case for retrial. In 1976, Judge Green reaffirmed her earlier decision and reinstated the order to promote Robinson. In July 1977, Robinson finally received her retroactive promotion to GS–13.

Ms. Robinson joined the class action in this Court, presenting evidence that her supervisor had recommended her for promotion to GS–13 in 1971, a year before her complaint in the individual case, and that she was turned down, although males were promoted to GS–13 and GS–14.

The Navy moved to dismiss the claim in the instant action, on the ground that Robinson did not formally apply for her promotion between March 1972 and June 1979. But as even a casual reader may deduce, Ms. Robinson was not able to apply for a GS–14 promotion because the Navy was litigating her non-promotion to GS–13 for five years. (Even if it be assumed that her lengthy litigation in the other action does not excuse her failure to apply here, it is well established that a claimant need not have formally applied for a promotion.)

At some point litigation must come to an end, even though it is always possible to offer more evidence ... We find it extremely troublesome—in light of the long and complex history of this litigation and in light of Judge Greene's patient and thoughtful treatment of the case—that the appellants would even propose that the trial court reopen and retry the matter. In the context of this case setting, such an adversarial tactic is irresponsible ... and wasteful of precious resources of litigants and the judiciary.

*Trout v. Lehman, supra,* 702 F.2d at 1106.

Similarly, Justice Stevens, dissenting from the Supreme Court's remand of this case, expressed the fear seven years ago that "the Court's action today encourages the kind of litigation strategy that gives the party with the greater resources a significant advantage unrelated to the merits of the case," noting further that the government's conduct in this case "has hardly been a model for future cases." *Lehman v. Trout, supra,* 465 U.S. at 1061, 104 S.Ct. at 1407. These comments were not only accurate when made; they were prophetic.

One is tempted to wonder what the judges of the Court of Appeals and the justices of the Supreme Court would think of the government's activities in the many years since these jurists deplored the then-existing delay. One must fear, however, that the Navy and the attorneys of the Department of Justice will see to it that we will find out.

Long after the most recalcitrant private employers have accepted the principle that discrimination against women is not only morally wrong but also illegal, the Navy, with assistance from Department of Justice counsel,[64] has fought these women at every turn, challenging almost every contention and litigating and relitigating almost every issue, with arguments that were often not only lacking merit in substance but were also foreclosed by the law of the case. This Court has complained again and again about the government's litigation tactics in this case, both orally and in written opinions, but the only effect appears to have been to cause counsel to redouble their efforts to relitigate matters long settled as well as to raise new issues, *see* Subsection C, *infra,* all with a view to delaying resolution of this case and to exhausting the women plaintiffs financially.

Why, one must wonder, has the Navy, with the assistance of Justice counsel, fought this case with such disregard for the proper operation of the judicial process and animosity toward these Navy women? It could not be that the Navy wishes to avoid the stigma of a finding of discrimination (as is sometimes true in Title VII cases), for discrimination by the Navy has already been found in this case—twice, in 1981 and 1986. The problem could not be the money to pay the judgments, for, as discussed in Subsection B, *infra,* it apparently cost the government far more to fight this action than any judgment that could reasonably have been rendered against it. In view of all the factors, the only reasonable explanation for the performance of the Navy and Justice in this case is that they are seeking to deter others who might consider complaining and litigating about sex discrimination by the Navy. That, of course is inadmissible.

### B. Financial Considerations

In the course of the many years of litigation, the government has spent extraordinary amounts of money for attorneys, expert fees, and other expenses while exerting utmost financial pressure on those plaintiffs not represented by large law firms. Thus, the government has spent nearly $2 million in expert witness fees on the most recent round of litigation alone. *See also,* note 49, *supra.* Yet the differ-

---

**64.** The Civil Rights Division of the Department of Justice prides itself on its achievements in the fight against discrimination, including discrimination on account of sex. *See, e.g.,* United States Department of Justice, *Legal Activities 1991–1992* at 40 (Civil Rights Division "has been successful in obtaining back pay awards in suits involving individual claims of discrimination ... on the basis of ... sex....") The Civil Rights Division might consider counseling those in the Department of Justice who have been battling against relief and justice to the women in this case who have long ago been judicially found to be the victims of sex discrimination.

ence between plaintiffs' claims for relief and the government's figure is less than $625,000. This kind of disparity between expenditure and any likely judgment appears to hold true for the entire eighteen-year odyssey of this case. In these days of an enormous budget deficit, it would seem to be an extravagant waste of taxpayer funds for the Navy to spend millions of dollars in litigation expenses in order to save a fraction of that in damages to the women class members.

Not only have the Navy and Justice counsel long delayed the resolution of this case, they have also sought to make it unreasonably costly for their opponents to resist. The Navy and its counsel adamantly opposed a 1987 request by plaintiffs' counsel for interim attorneys' fees—hardly an unreasonable request after many years of litigation, the expenditure of a vast amount of funds, and an entirely favorable outcome to plaintiffs with respect to the class litigation. *See Brown v. Marsh,* 707 F.Supp. 21, 23 (D.D.C.1989); *McKenzie v. Kennickell,* 669 F.Supp. 529, 535 (D.D.C. 1987); *Jurgens v. EEOC,* 660 F.Supp. 1097, 1100–01 (N.D.Tex.1987). When the government's opposition was rejected by the Court, *Trout v. Lehman, supra,* 702 F.2d at 3, the Navy and its counsel commenced a further round of litigation on the issue of attorneys' fees,[65] and only when they had exhausted all avenues of ordinary and extraordinary review were the fees paid in 1989, over two years after they had been sought by plaintiffs.

It is interesting to contrast this treatment of individual counsel for the class members with the alacrity with which the Navy agreed to payment when the large law firm of Covington & Burling and the Lawyers' Committee for Civil Rights were brought in to contest issues relating to thirty-five of the plaintiffs herein. The

theretofore determined opposition of the Navy and its counsel suddenly collapsed, and they agreed to the requested substantive relief and to plaintiffs' attorneys' fees. At the same time, the Navy and its counsel kept opposing the claims of the thirty-two plaintiffs who had prevailed on summary judgment (even though the summary judgment cases were far more likely to be meritorious than the others in which there were factual, in addition to legal, issues).

Here again, it is difficult to escape the conclusion that the Navy and its counsel did not believe that they could wear out Covington & Burling and the Lawyers' Committee, and so they settled with those lawyers and the claimants they represented, but that it seemed worthwhile to attempt to exhaust financially the small law firm that had handled this class action, most of the time without receiving any payment. Large corporations may occasionally engage in that sort of tactic when dealing with a nuisance critic, as do also some affluent defendants in criminal cases who hope to wear out prosecution witnesses by delays and postponements, and who believe that, somehow, with the passage of time and the expenditure of funds, they will be able to minimize or eliminate their exposure. But the United States Navy and the Department of Justice?

### C. Five Individual Claims

While the previous discussion places the conduct of the Navy and of Justice counsel in its larger context of overzealous litigation, one of counsels' tactical steps must be discussed separately.

As noted above, despite the Court's finding of classwide discrimination, the Navy and Justice counsel chose to contest nearly every individual claim. However, there were five claims they did not contest.[66] *See* Section IV–F, *supra.* On March 22,

---

**65.** Government counsel opposed plaintiffs' request and sought extensive discovery. On August 5, 1988, this Court directed the Navy to pay $291,478.01 in interim attorneys' fees and costs. The Navy appealed the order but the Court of Appeals dismissed the appeal (*Trout v. Ball,* No. 88–5264 (D.C.Cir. March 30, 1989)). The Navy then moved for rehearing en banc and petitioned for a writ of mandamus. The Court of

Appeals dismissed the appeal, and denied the mandamus petition in 1989. *Trout v. Garrett,* 891 F.2d 332 (D.C.Cir.1989).

**66.** These five claims are those of Marie M. (Lassiter) Broughton, Claire C. Chong, Carolyn M. Harwood, Faye B. Tolliver, and Carole A. Velvin.

1989, Justice counsel filed a memorandum in this case on behalf of the Navy in which they described these five claims as "undisputed," and announced their intention "not to contest" them. Defendants' Response to the Class Members Proof of Claim Forms at 1 (March 22, 1989). If there was any doubt about the meaning of the March 22 memorandum, it was dispelled by a number of other filings entitled, for example, "Defendants' Determination to Retroactively Promote Ms. Claire Chong," wherein it is stated that "NARDAC has decided to retroactively promote Ms. Chong based upon her Qualifications," *see* Defendants' Objections Regarding the Retroactive Promotion (October 25, 1990) at 6, and similar memoranda regarding claimants Tolliver, Broughton, Haywood, and Velvin.[67]

Plaintiffs thereafter filed for summary judgment with respect to these five and other claimants, and Navy–Justice counsel again responded that they would not contest these five claims. Defendants' Cross Motion for Summary Judgment (July 17, 1989) at 23.[68] The Special Master consequently granted summary judgment to these five plaintiffs. Government counsel thereafter continued to file objections to nearly every adverse ruling of the Special Master—except to the grant of summary judgment to the five uncontested claims. Indeed, on April 24, 1990, counsel represented that these claimants would be promoted as of specific dates as follows:

| Claimant | Grade Level to Which Claimant is to be Promoted | Proposed Date of Promotion |
| --- | --- | --- |
| Marie Broughton | 13 | August 18, 1976 |
| Claire Chong | 13 | June 6, 1972 |
| Faye Tolliver | 13 | November 20, 1977 |
| Carole Velvin | 13 | October 23, 1977 |
| Carolyn M. Harwood | 14 | April 8, 1979 |

Notwithstanding this history of concessions, representations, and commitments, Justice counsel filed on September 20, 1990, eighteen months after the first concession, what was labelled a "Statement Regarding the Status of Backpay Claims for [the Five Claimants]." In that filing, counsel informed the Special Master and the plaintiffs for the first time that, contrary to all the previous representations, not only had promotions not taken place, but the Navy would not promote these five women until it had fully exhausted its claimed right to appeal the question of liability for discrimination of the entire class. *Id.* at 6.[69] Before this Court, the Navy–Justice team is taking the same position. Defendants' Objections Regarding Retroactive Promotions (October 25, 1990).

The only explanation given for this about-face is the statement of Justice De-

---

67. The Broughton memorandum states that the Navy would not contest the case because it was not "winnable under the clear and convincing standard." *Id.*

68. In a section entitled "Relief Should be Limited to the Four GS–13 and One GS–14 Position," counsel stated:
> In recognition of the clear and convincing evidentiary standard imposed upon defendants at the individual relief hearings, defendants have stated that five additional promotions of females would have been appropriate during the period of March 1972 to June 1979....

Thus, defendants contend that this make whole relief, should be limited to Ms. Marie Lassiter Broughton, Ms. Claire Chong, Ms. Carolyn Harwood, Ms. Faye B. Tolliver, and Ms. Carole Velvin....
Defendants' Cross–Motion for Summary Judgment at 23 (July 17, 1989).

69. Government counsel, without any embarrassment regarding the belated change of position, stated that all along they had argued a "unitary position" in which the promotion of the five claimants was subject to an ultimate determination that the Court's liability determination was correct "following entry of final judgment in this case and exhaustion of any appeals that might be taken." Defendants' Statement Regarding the Status of Backpay Claims for [the Five Claimants] at 6 (September 20, 1990).

partment counsel that their "papers were poorly drafted, and unfortunately conveyed the distinct impression that these promotions were an accomplished fact, rather than part of the unitary position above described which, if accepted, would have resolved the issue of relief, subject to defendant's right to appeal the finding of liability." Defendants' Objections to the Memorandum and Order of the Special Master Regarding Retroactive Promotions and Back Pay for Five Uncontested Claimants at 13 (October 25, 1990).[70] The claim that there was a "unitary position" of which the five claimants were a part is pure fiction.

In litigation, a decision not to contest a claim or issue is obviously a decision for all time, particularly when the opposing party relies thereon and the tribunal enters rulings thereon—rulings which are the law of the case. *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) (the law of the case "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"); *Laffey v. Northwest Airlines, Inc.,* 642 F.2d 578 (D.C.Cir.1980); *Chrysler Credit Corp. v. Country Chrysler, Inc.,* 928 F.2d 1509 (10th Cir.1991); *Piazza v. Aponte Rogue,* 909 F.2d 35 (1st Cir.1990); *Liddell v. Missouri,* 731 F.2d 1294, 1304–05 (8th Cir.1984) (the doctrine of the law of the case protects settled expectations of parties, ensures uniformity of decisions and promotes judicial efficiency);

*Hopkins v. Price Waterhouse,* 737 F.Supp. 1202, 1208 (D.D.C.1990); Wright, Miller, Cooper, *Federal Practice and Procedure* § 4478 (1981).

■ A defendant cannot forego its opportunity to challenge a claim (and thereby deprive the plaintiffs of their opportunity to rebut the challenge) only to reopen the issue much later when it might choose to do so.[71] The reasons given by Justice counsel—their papers were poorly drafted or that everyone misunderstood their position (notwithstanding that it was stated and restated)—are frivolous and they appear to represent the assumption that the normal rules applicable to other litigants do not apply to the government. However, as explained below, the rules of substance and procedure apply to government counsel as to all others.

■ Justice counsel argue that the government is being implicitly and improperly estopped from redefining its position regarding the five claimants. But estoppel is not at issue; indeed, counsels' references to estoppel decisions underscore the inapplicability of that doctrine. This is not a case, like *Office of Personnel Management v. Richmond,* — U.S. ——, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), where agency personnel gave mistaken advice to an individual or mistakenly made a promise.[72] There, the critical fact was that the agency was prohibited by statute from doing what its agent or employee had erroneously promised. To bind the government to that

---

**70.** Counsels' argument that their decision to promote and not contest the five claims was meant to be conditional upon a final determination of class-wide liability is without record support. Moreover, that argument is illogical as well. Defendants obviously cannot condition their position as to the five claimants on the Court's determination of the other claims. *See In re Ampicillin,* 81 F.R.D. 377 (D.D.C.1978).

**71.** Although parties may object to the findings or rulings of a special master, *see* Fed.R.Civ.P. 53(e)(2), under the doctrine of the law of the case a party cannot forego its opportunity to raise an issue or object at one point in the litigation only to raise it later. Departure from this doctrine would lead to the absurd result, as Judge Friendly said, "that a party who has chosen not to argue a point on a first appeal should

stand better as regards the law of the case than the one who argued and lost." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1982). *See Northwestern Indiana Tel. Co. v. FCC,* 872 F.2d 465, 470 (D.C.Cir.1989); *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,* 810 F.2d 243, 250 (D.C.Cir.1987); *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.,* 724 F.2d 1456, 1457 (11th Cir.1983); *Arnold v. Eastern Air Lines, Inc.,* 681 F.2d 186, 206 n. 22 (4th Cir.1982); *Raxton Corp. v. Anania Associates,* 668 F.2d 622, 624 (1st Cir.1982). This principle applies equally to an objection from the ruling of a special master. *Cf. McCarthy v. Manson,* 714 F.2d 234, 237 (2d Cir.1983).

**72.** *See also, Grumman Ohio Corp. v. Dole,* 776 F.2d 338 (D.C.Cir.1985).

promise would have meant that the government would be compelled by a court to do that which Congress had forbidden. As the Supreme Court noted, such a ruling would have vested government agents with a power the Congress could not contain.

In this case, by contrast, there was no such statutory directive; on the contrary. The Navy represented that it would promote claimants with excellent qualifications who were alleged to be the victims of sex discrimination. Such a representation, far from being prohibited, is precisely what Congress sought in enacting Title VII. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975) (purpose of Title VII is to eradicate discrimination in the economy and to make victims of past discrimination whole); *id.* at 417–18, 95 S.Ct. at 2371–72 (backpay relief is an important spur and catalyst toward achieving the goals of Title VII).[73]

Furthermore, counsels' representations were made in the context of trial proceedings. The requirement in the Rules of Civil Procedure (*see* Subsection D, *infra*) that an attorney's signature certifies the legitimacy of his representations differentiates statements made by counsel in litigation from misinformation erroneously conveyed to a member of the public by agency personnel. *See OPM v. Richmond, supra,* 110 S.Ct. at 2468.[74] Once the government enters litigation, the Rules of Civil Procedure[75] and other doctrines governing court proceedings limit its power to disavow its agents' representations. Judicial proceedings could become charades if every statement made in court by government lawyers could subsequently be renunciated with claims of immunity to estoppel.

For the reasons stated, the Court affirms the decision of the Special Master as to

defendants' liability to the five claimants, but modifies the relief in the cases of Harwood and Chong.

### D. Violations of Rule 11

■ What occurred in the course of this litigation requires the Court to explore the issue of possible violations of Rule 11 of the Federal Rules of Civil Procedure. That Rule reads as follows:

> The signature of an attorney or party constitutes a certificate by the signer that he has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

It appears that counsel for the Navy *prima facie* violated two aspects of that Rule: (1) the provision that the signature of an attorney constitutes a certificate by the signer that to the best of his knowledge, information and belief formed after reasonable inquiry, the filing is warranted by existing law, and (2) the provision that the filing is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

First. As a matter of law, the five claims discussed in Subsection C above were settled certainly no later than January 11, 1990, when the Special Master granted summary judgment to the plaintiffs. Counsel for the Navy made clear and definitive representations to the Special Master; they expressly decided not to

---

**73.** As indicated above, where there are inherent ambiguities in determining relief, courts are to err on the side of providing, rather than withholding, relief. *Day v. Mathews, supra,* 530 F.2d at 1086.

**74.** In fact, it has long been established that even mistaken representations of a government agent are binding if they are within the scope of his authority. *The Floyd Acceptances,* 74 U.S. (7

Wall.) 666, 19 L.Ed. 169 (1869); *see Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 2469, 110 L.Ed.2d 387 (1990).

**75.** *See* Fed.R.Civ.P. 1; Fed.R.Civ.P. 81 (identifying specific instances where rules of civil procedure do not apply but fail to identify any exemption specifically applicable to the United States).

contest the claims of these five plaintiffs; they did not oppose the granting of summary judgment; summary judgment was, in fact, granted by the Special Master; and the claims of these five plaintiffs were not thereafter further litigated on their merits before the Special Master as were others on which factual, evidentiary hearings were held.

Under the doctrine of the law of the case, the Navy could not reopen what had already been decided. That rule must be adhered to all the more when, as here, the decision was based on the express representations of the party now seeking a change. The impropriety of these actions is further underlined because the papers filed in this Court lack even the candor to suggest that counsel are seeking a reconsideration of what has been decided, arguing instead that they have simply been misunderstood all along, and now desire to make clear that prior rulings based on their papers misconstrued their position.

■ There is no good faith basis for this argument. On this aspect of Rule 11, the Court need not explore whether counsel for the Navy in fact were or were not subjectively motivated by good faith. Rule 11 is to be applied under an objective test. *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* — U.S. —, 111 S.Ct. 922, 935, 112 L.Ed.2d 1140 (1991); *Westmoreland v. CBS, Inc.,* 770 F.2d 1168, 1177 (D.C.Cir.1985). Objectively, the Navy's papers filed on March 22, 1989 and thereafter in this matter represented both a concession and a promise to promote the claimants. Even counsel for the Navy implicitly concede, as they must, the objective meaning of their papers, for the only explanation even now provided is that "these papers were poorly drafted, and unfortunately conveyed the distinct impression that these promotions were an accomplished fact, rather than part of the unitary position above described ... Defendants regret that their papers were not more carefully prepared." Defendants'

Statement Regarding the Status of the Back Pay Claims at 5, 6 (September 20, 1990).

This argument betrays a misunderstanding of the judicial process. If it was the "poor drafting" of counsel that gave the plaintiffs, the Special Master, and the Court a certain "distinct impression," it is counsel and those they represent who must accommodate the result. It is not the judicial bodies that must reopen every facet of a case because, as it turns out, a litigant meant one thing when it said another.[76] However, more important, given the plain meaning of the Navy's papers, there is no objective factual basis for the government's newly proffered "unitary position." Until the September 20, 1990 filing at issue, the Navy and its counsel themselves averred the plain meaning of their original position: that they could not prevail with respect to these five plaintiffs; that judgment should be entered against the Navy with respect to these five; and that the Navy would promote them. That September 20 filing could not be regarded as well grounded in fact and warranted by existing law or a good faith argument for its extension or modification.

Second. The repudiation of the Navy's prior position also contravenes the harassment, delay, and cost clauses of Rule 11. Because there is no objective basis for reading the Navy's filings as counsel now do, and because they repeatedly adopted the plain meaning of the concession in other statements and by their failure to object to summary judgment being entered in those cases, this newly-found "unitary position" serves only unduly to delay this litigation.

When the new "unitary position" argument is viewed in the context of the litigation tactics described in Subsections A and B, *supra,* the Court is compelled to conclude that it was intended further to harass plaintiffs, to prolong the litigation, and to serve to force these plaintiffs, who were

---

**76.** *See* notes 70 and 71, *supra.* Although defendants may of course object to rulings of the Special Master, they cannot condition an objection on the outcome of other aspects of the case, nor object to those matters which they could have challenged but did not.

promised promotions years ago, to continue to absorb legal costs.[77]

It is well established that District Courts have wide discretion under Rule 11 in determining lack of factual basis or improper purpose, precisely because the "district court has tasted the flavor of the litigation and is in the best position to make these kinds of determinations." *Westmoreland v. CBS, Inc., supra,* 770 F.2d at 1174; *see also, International Brotherhood of Teamsters v. Ass'n of Flight Attendants,* 864 F.2d 173, 176 (D.C.Cir.1988).

The Court concludes that there is substantial evidence that the motion of September 20, 1990 lacked a good faith basis both in law and in fact, and that it was interposed for the improper purpose of harassing the plaintiffs, delaying this litigation, and increasing the costs that plaintiffs must bear.

The next question to be determined is who is to be sanctioned in this case pursuant to Rule 11? The Court has concluded that the principal responsibility for the violations appears to rest with the Navy, and that assistance with respect to the violations was rendered by Justice Department counsel.

■■■ Under Rule 11 it is the signature of the attorney that certifies the legitimacy of the filing. The September 20, 1990 filing that is the subject of this Rule 11 discussion bears the signatures of three members of the Office of the United States Attorney. However, only one of these, that of Assistant U.S. Attorney Thomas S. Rees, is an actual signature. The signatures of United States Attorney Jay B. Stephens and of Assistant U.S. Attorney John D. Bates were apparently affixed by Mr. Rees, for they appear to be his handwriting and are followed by the initials "(TSR)."

■■■ Although the Court could, under the law, proceed against the other two counsel as well, *Robinson v. Chicago,* 868 F.2d 959 (7th Cir.1989) (Corporation Counsel of City of Chicago held liable under Rule 11 even though his name was affixed to pleading by one of his assistants), it will not do so. There is no evidence that Mr. Stevens and Mr. Bates had enough knowledge of the history of this litigation to appreciate the frivolousness of the representations made in the September 20, 1990 filing. Moreover, the Court believes that the relatively blunt instrument of sanctions against individual attorneys ought to be applied with restraint.[78]

■■■ Rule 11 sanctions may lawfully be imposed not only upon the signing attorney but also upon the "represented party." The parties represented by Justice counsel in this case are technically the Secretary of the Navy and the Commander of NARDAC, but in reality the party is the Department of the Navy. It is the Navy that had it within its power to promote or not to promote these five victims of discrimination, and it is that Department that is not only the original discriminator but also the one that, as the history of this litigation demonstrates, has been guilty of delay and undue proscrastination. In light of the conduct of the Department of the Navy in

---

**77.** If the Court were to accept the Navy's current position, it might have to remand the factual and legal disputes regarding these five plaintiffs to a new Special Master (*see Trout v. Webb, supra,* 708 F.Supp. at 358) for further consideration and hearings to be followed by the inevitable Navy appeals if one or more of these plaintiffs were to prevail.

**78.** The fact that these attorneys, and in particular Mr. Rees, represent the United States does not preclude the application of Rule 11. *Mattingly v. United States,* 939 F.2d 816, 818–19 (9th Cir.1991) (the government is not exempt from Rule 11 sanctions on the ground of sovereign immunity); *Adamson v. Bowen,* 855 F.2d 668 (10th Cir.1988) (28 U.S.C. § 2412 waives government sovereign immunity as to Rule 11 sanctions); *United States v. Gavilan,* 849 F.2d 1246, 1251 (9th Cir.1988) (the government is subject to the Rules of Civil Procedure when it enters a claim as a civil litigant); *see Andrulonis v. United States,* 724 F.Supp. 1421, 1537 (N.D.N.Y. 1989); *Joseph v. United States,* 121 F.R.D. 406, 413–14 (D. Hawaii 1988); *National Association of Radiation Survivors v. Turnage,* 115 F.R.D. 543 (N.D.Cal.1987); *Larkin v. Heckler,* 584 F.Supp. 512 (N.D.Cal.1984); *cf. Sierra Club v. Ruckelshaus,* 21 ERC (BNA) 2153 (N.D.Cal.1984) (holding the Director of the United States Environmental Protection Agency in contempt for failure to comply with court order).

this case and its intimate involvement in the promotions (or non-promotions) at issue, the Court cannot treat the matter as simply a legal strategem for which the represented party has no responsibility, connection, or knowledge. The Court, therefore, will include in its order to show cause the relevant represented party, the Secretary of the Navy.[79] *See Westmoreland v. CBS, Inc., supra,* 770 F.2d at 1168; *Saunders v. Lucy Webb Haynes–National Training School,* 124 F.R.D. 3 (D.D.C. 1989); *Weisman v. Rivlin,* 598 F.Supp. 724 (D.D.C.1984).

The Order to Show Cause being issued this date is accordingly directed at the Hon. H. Lawrence Garrett III, the Secretary of the Navy. However, it may be—indeed it is likely—that some other individual or individuals in the Navy hierarchy were responsible for directing the Navy strategy in this litigation. If that be so, the Secretary may so advise the Court in his Response to the Order to Show Cause, and the Court will on that basis consider substituting other individuals or the Department itself for the Secretary.

■ The Court has not come lightly to its conclusion that Rule 11 proceedings should be initiated. It is imperative that attorneys for the United States, or for any other party before the Court, be free to litigate creatively and vigorously. But where the line between creative and vigorous representation, on the one hand, and frivolousness and harassment, on the other, is crossed as in this instance, neither this Court nor any court can turn its eye. *See Westmoreland v. CBS, Inc., supra,* 770 F.2d at 1180.

■ Rule 11 affirmatively commands such vigilance. Indeed, it is well established that where Rule 11 has been violated, a court is *required* to impose sanctions. *Saltany v. Reagan,* 886 F.2d 438, 439 (D.C.Cir.1989), *citing Weil v. Markowitz,* 829 F.2d 166, 171 (D.C.Cir.1987); *West-*

*moreland v. CBS, Inc., supra,* 770 F.2d at 1174–75. As the Court of Appeals for this Circuit has instructed, citing Judge Schwarzer:

> Of all the duties of the judge, imposing sanctions on lawyers is perhaps the most unpleasant. A desire to avoid doing so is understandable. But if judges turn from Rule 11 and let it fall into disuse, the message to those inclined to abuse or misuse the litigation process will be clear. Misconduct, once tolerated, will breed more misconduct and those who might seek relief against abuse will instead resort to it in self-defense.[80]

Inasmuch as the issue of Rule 11 is being raised *sua sponte* by this Court, sanctions will not be imposed at this time. Rather, an order is being issued contemporaneously herewith affording an opportunity to Thomas S. Rees, Esq., and to the Secretary of the Navy, on behalf of that Department, to show cause why sanctions pursuant to Rule 11 should not be issued. This order to show cause will provide the respondents with notice and opportunity for a response consistent with the requirements of due process. *See Tom Growney Equipment, Inc. v. Shelley Irrigation Development, Inc.,* 834 F.2d 833 (9th Cir.1987).

## ORDER

Upon consideration of plaintiffs' and defendants' objections to the reports of the Special Master; the oppositions thereto, the reports of the Special Master; and the entire record herein; it is this 27th day of November, 1991, in accordance with the Opinion being issued contemporaneously herewith

ORDERED that plaintiffs' objections to the Reports of the Special Master be and they are hereby denied; and it is further

ORDERED that the defendants' objections to the Reports of the Special Master

---

79. There is no evidence that the other named defendant in this case, the Commander of NAR-DAC, is involved in these decisions or the conduct of this litigation, and the Court therefore finds no basis for inclusion of that party.

80. *Westmoreland v. CBS, Inc.,* 770 F.2d 1168, 1180 (D.C.Cir.1985), *citing* Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look,* 104 F.R.D. 181, 205 (1985).

be and they are hereby granted in part and denied in part; and it is further

ORDERED that the Reports of the Special Master be and they are hereby adopted in accordance with the Opinion be issued concurrently and with modifications as to the relief calculations of claimants Claire Chong and Carolyn Harwood; and it is further

ORDERED that claimants Claire Chong and Carolyn Harwood be and they are hereby awarded backpay relief in accordance with the regression formula adopted by this Court; and it is further

ORDERED that the remaining objections of defendants be and they are hereby denied; and it is further

ORDERED that defendants shall promptly comply with the relief awards specified in the appendix to this Order; and it is further

ORDERED that Thomas S. Rees, Esq. and H. Lawrence Garrett, III, Secretary of the Navy, show cause within twenty-five days why sanctions should not be imposed pursuant to Fed.R.Civ.P. 11.

## APPENDIX

The following is a list of backpay awards for claimants adopted by this Court from the report of the Special Master.[1]

| Claimant | Backpay Relief |
| --- | --- |
| Alf, Susan L. | $ 3,133.90 |
| Amendolair, Dorothy M. | 26,174.60 |
| Aquino, Sandra R. | 4,714.00 |
| Bedell, Judy M. | 20,280.70 |
| Bennett, Sandra H. | 2,357.00 |
| Bents, Margaret | 21,987.10 |
| Boisen, Lavon | 23,185.10 |
| Boyd, Patricia A. (Hardisty) | 2,284.10 |
| Bradford, Anna L. | 1,604.50 |
| Broughton, Marie M. (Lassiter) | 19,232.30 |
| Brown, Nancy J. | 9,566.20 |
| Callier, Ellen (Becker) | 6,721.80 |
| Chong, Claire C. | 22,957.20 |
| Clum, Carole A. | 19,872.70 |
| Dally, Lyndall Chambers | 2,032.20 |
| Davis, Ellen S. | 3,278.00 |
| DeRoche, Patricia | 6,831.30 |
| Eakin, Anne W. | 18,475.10 |
| Fields, Lorene Tuggle | 2,821.60 |
| Fiorillo, Frances S. | 24,182.10 |
| Fleetwood, Latricia A. | 3,604.70 |
| Fox, Patricia H. | 2,992.20 |
| Gaskins, Sandra R. | 8,037.60 |
| Gibson, Barbara C. | 16,511.70 |
| Groover, Marjorie K. | 10,917.70 |
| Halicki, Crystal G. | 10,497.80 |
| Harlow, Janice M. (Hellickson) | 3,186.70 |
| Harris, Shirley E. | 2,232.00 |
| Harwood, Carolyn | 18,162.30 |
| Herrington, Marilyn J. | 11,114.60 |
| Hopkins, Rosie B. | 2,746.90 |
| Horton, Essie D. | 13,665.60 |
| Jackson, Linda L. (O'Toole) | 15,709.00 |
| Jafari, Suzanne A. | 4,674.20 |
| Jenkins, Joyce J. (Branch) | 8,250.60 |
| Johnson, Donna H. | 751.50 |
| Jones, Pearl M. | 3,065.40 |

[1] The backpay relief has been modified in the cases of claimants Chong and Harwood.

| Claimant | Backpay Relief |
|---|---|
| Kelly, Delores A. | $ 802.00 |
| Kim, Rose H.Y. | 21,172.10 |
| Kratz, Caroline J. | 4,701.00 |
| Lee, Vernice | 6,015.00 |
| MacMillian, Thelda Y. (Samuels) | 3,672.30 |
| Malterud, Flora C. | 26,572.90 |
| Mengel, Janice K. | 15,034.40 |
| Miles, M. Frances | 7,066.50 |
| Miner, Helen E. | 3,403.30 |
| Nankivell, Edith L. | 18,475.10 |
| Nelson, Bernice W. | 209.50 |
| Newton, Judith J. | 8,645.30 |
| O'Malley, Joanne Kelly | 2,190.60 |
| Owens, Danice G. | 467.00 |
| Perlingiero, Clara A. | 21,718.30 |
| Quade, Catherine E. (Miller) | 1,431.40 |
| Reveley, Helene D. | 5,954.80 |
| Robinson, Lucretia A. | 23,377.00 |
| Rouse, Kay E. | 8,773.75 |
| Russell, Susan K. (George) | 2,080.90 |
| Schabacker, Kathleen N. | 13,978.30 |
| Smith, Ruby E. | 20,100.80 |
| Stanhope, Susan (Folsom) | 1,997.30 |
| Stough, Ruby G. | 21,864.20 |
| Tolliver, Faye B. | 18,529.90 |
| Trimble, Kristen K. | 6,580.60 |
| Velvin, Carole A. | $ 18,142.60 |
| Wallace, Andrea Dean | 2,831.80 |
| Weaver, Brenda J. | 1,595.20 |
| Woods, Sharon K. | 5,206.90 |
| **TOTAL** | **$670,402.75** |