**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**July 21, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 02-30499

CHARLES ALBRIGHT, III, ET AL.,

Plaintiffs,

CHARLES ALBRIGHT, III; MICHAEL ALLSBROOK; BRUCE BOND, SR; PETE BOWEN; SAMUEL BUA; ANTHONY CAPRERA; JOHN CASTELLUCCIO; DAVID DAUGHTRY; GAROLD FAYARD; WALTER GIFFORD; MICHAEL GOODSON; STANLEY HOOGERWERF; EDWARD HIRSTIUS; GARY LEE; ISIDRO MAGANA; PAUL MCCASKELL; NORMAN MCCORD, JR; MICHAEL RICE; JOHN RONGUILLO; JAY SAACKS; TROY SAVAGE; JAMES SCOTT; FENNER SEDGEBEER; DAVID SLICHO; LEROY SMITH, JR; LARRY STOKEY; JAMES W WARD; JULIE WILSON; CLIFFORD WOOD; DENNIS DEJEAN; JOHN FAVALARO, III; MARJORIE POWELL; MICHAEL GLASSER; STEPHEN DUNN; EARLE FRISARD

Plaintiffs/Appellants/Cross-Appellees,

VERSUS

THE CITY OF NEW ORLEANS, ET AL.,

Defendants,

THE CITY OF NEW ORLEANS

Defendant/Appellee/Cross-Appellant,

and

MARC H. MORIAL, Individually and in his Official Capacity as Mayor of the City of New Orleans; RICHARD PENNINGTON, Individually and in his Official Capacity as Superintendent of Police for the City of New Orleans

Defendants/Appellees

_____

BARRY FLETCHER, ET AL.,

Plaintiffs,

-1-

BARRY FLETCHER; STEPHEN DUNN; MICHAEL GLASSER; EARLE FRISARD;
BRUCE LITTLE

Plaintiffs/Appellants

VERSUS

THE CITY OF NEW ORLEANS, ET AL.

Defendants,

THE CITY OF NEW ORLEANS; RICHARD J. PENNINGTON, Individually and
in his Official Capacity as Superintendent of police for the City
of New Orleans

Defendants/Appellees

Appeals from the United States District Court
for the Eastern District of Louisiana
(96-CV-679)

Before DeMOSS, DENNIS, and PRADO, Circuit Judges.

DENNIS, Circuit Judge:[*]

Plaintiffs/appellants/cross-appellees Charles Albright, III and 34 other New Orleans police officers ("Albright plaintiffs") sued defendant/appellee/cross-appellee City of New Orleans ("City"), among others, for discriminatory hiring practices in promoting New Orleans police officers to sergeant and lieutenant positions. Both parties now argue that the district court abused its discretion in awarding $434,278.90 in compensatory damages to

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

-2-

the Albright plaintiffs.  For the following reasons, we affirm.

I.

This case is one of several suits filed by white New Orleans police officers challenging the promotion policies of the New Orleans Police Department ("NOPD").  The Albright plaintiffs are 35 white NOPD police officers and sergeants who were on a list of those eligible for promotion to the ranks of sergeant and lieutenant.  They allege that they were passed over for promotion in favor of black officers during a round of promotions in March 1995.

Promotions among the ranks of the NOPD are governed by the rules and regulations of the Civil Service Commission ("CSC").  Officers seeking promotion to the ranks of sergeant and lieutenant take an examination administered by the CSC, which then creates a promotional register that ranks the passing candidates according to their performance on the exam.  When promotions are awarded, officers from the most recent promotional register are selected.

In March 1995, promotions to the ranks of sergeant and lieutenant were also governed by the terms of the consent decree entered into by the City and plaintiffs in *Williams v. City of New Orleans*, C.A., No. 73-629.  The *Williams* consent decree was designed in part to provide equal employment opportunities within the NOPD and to eliminate the effects of prior racial

discrimination. As part of that program, officers on the promotional rosters were grouped into "bands" according to their scores on the CSC's examination. All promotions were to be made first from the band with the highest scores (the lower numbered bands) until that band was exhausted, and then from the band with the second highest scores and so forth until the list expired. All candidates in a band were deemed of equal qualification for purposes of promotion.

The *Williams* decree also created "supernumerary" or "additional" positions that could only be filled by black police officers. Promotions to these positions could be filled by a black candidate from a higher numbered band without exhausting the current band if no black officers remained in the current band. Besides these supernumerary positions, promotions were to be made in strict accordance with the band system's exhaustion requirements and the City was forbidden to unlawfully discriminate on the basis of race or color against any employee of NOPD.

In October 1994, Police Superintendent Richard J. Pennington began his tenure with NOPD. By March 3, 1995, when the promotions at issue were made, all officers in Bands 1 through 4 of the sergeants roster had been promoted to the rank of sergeant. In Band 5, all of the black officers had been promoted, leaving 34 non-black officers. Band 6 consisted of both black and non-black officers. All of the supernumerary sergeant positions were filled.

Thus, according to the terms of the decree, the 34 non-black officers remaining in Band 5 had to be promoted to sergeant before any officers, including black officers, in Band 6 could be promoted.

Nevertheless, on March 3, 1995, the City bypassed all but 1 of the 34 candidates in Band 5 to promote black officers from Band 6 to the rank of sergeant. This was accomplished by promoting black sergeants in supernumerary positions to the rank of lieutenant, thereby freeing up several supernumerary sergeant positions. Under the terms of the decree, the City was then able to promote black sergeant candidates from Band 6 to fill the now-vacant supernumerary positions.

As for promotions to the rank of lieutenant, on March 3, 1995, all sergeant candidates in Bands 1 through 3 of the lieutenants' register had been promoted to lieutenant, thereby exhausting those bands. Three supernumerary lieutenant positions were vacant. Band 4 consisted of 34 officers, including 5 black officers. On March 3, 1995, the City promoted 6 officers - the 5 black officers and 1 white officer - from Band 4 into regular (non-supernumerary) lieutenant positions. With the promotion of the 5 black candidates from Band 4, the City was then able to bypass the remaining 28 non-black officers in Band 4 to promote 3 black officers from Band 5 into the 3 vacant supernumerary positions. Thus, the City promoted a maximum number of black candidates by selecting black

candidates from Band 4 to fill regular non-supernumerary positions.

In February 1996, the Albright plaintiffs filed suit against the following defendants: the City of New Orleans, then-Superintendent Pennington, then-Mayor Marc Morial, and then-Chief Administrative Officer Marlin Gusman. In their original complaint, the Albright plaintiffs alleged that the City was in violation of the *Williams* consent decree. They later sought to amend their complaint to assert claims of intentional race discrimination under Title VII, but in January 1999, the district court dismissed these claims as time-barred. In April 1999, the remaining claims were tried and judgment was rendered in favor of the defendants.

Plaintiffs appealed, and in November 2000, this court affirmed the district court's judgment in favor of the defendant on the non-Title VII claims, but reversed the district court's finding that the Title VII claims were time-barred and remanded these claims for a trial on the merits.[2] On remand, the parties agreed to separate the issues of liability and damages. On June 26, 2001, after a bench trial, the district court found the City liable for impermissibly considering race when selecting officers for promotions in violation of Title VII and the Fourteenth Amendment, but dismissed all claims against the remaining defendants.

---

[2] *Albright v. City of New Orleans*, No. 99-30504, Nov. 1, 2000 (unpublished).

On January 24, 2002, after a one-day bench trial on damages, the district court found the City liable for $434,278.90 in compensatory damages, as well as post-judgment interest and reasonable attorneys' fees.  The Albright plaintiffs timely appealed and the City cross-appealed.[3]  Both parties challenge the amount of Title VII compensatory damages the district court awarded.  The Albright plaintiffs contend that the award was insufficient to compensate them for their damages, and the City asserts that the award was excessive.

## II.

Under Title VII, "[i]f the court finds that the respondent has intentionally engaged in ... an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court

---

[3]  Because the Albright plaintiffs have not challenged the dismissal of its claims against Mayor Morial, Superintendent Pennington, and CAO Gusman, they are not parties to this appeal. Another group of New Orleans police officers (Fletcher plaintiffs) did file a brief in case its appeal in Case No. 01-30742 was deemed premature.  But another panel of this court has determined that their appeal was not premature and have adjudicated their claims. *Albright v. City of New Orleans*, 2003 WL 21919429, at *3 (5th Cir. Aug. 11, 2003)(unpublished).  Therefore, it is not necessary to consider the issues raised in the Fletcher plaintiffs' brief here.

deems appropriate."[4]  "In formulating relief in employment discrimination cases, the court has broad discretion to fashion remedies as the equities of a particular case compel."[5]  Courts should attempt to fashion remedies that serve the purposes of Title VII, which are to compensate the victims of past discrimination and deter employers from discriminating in the future.[6]  And as an appellate court, "[w]e will not intervene absent a showing of clear abuse."[7]

## III.

The district court awarded a total of $434,278.90 in compensatory damages; the court arrived at this figure by using calculations from the economic experts of both sides.  First, the court used the calculations of plaintiffs' expert Dr. Bernard Pettingill to determine how much a promotion was worth to each individual plaintiff based on the additional wages and retirement benefits each officer would have received had they been promoted.

---

[4]  42 U.S.C. 2000e-5(g)(1).

[5]  *U.S. v. Criminal Sheriff, Parish of Orleans*, 19 F.3d 238, 239-40 (5th Cir. 1994)(citing *LeBlanc v. Southern Bell Tel. & Tel. Co.*, 460 F.2d 1228, 1229 (5th Cir. 1972)).

[6]  *See Walsdorf v. Bd. of Cmm'rs for the E. Jefferson Levee Dist.*, 857 F.2d 1047, 1054 (5th Cir. 1988).

[7]  *Criminal Sheriff, Parish of Orleans*, 19 F.3d at 239-40 (citing *Harper v. Thiokol Chem. Corp.*, 619 F.2d 489, 494 (5th Cir.1980); *Local 53 v. Vogler,* 407 F.2d 1047, 1052-53 (5th Cir.1969)).

These calculations took into account the various circumstances of each individual officer, including the officer's age, the officer's years of service, and whether the officer had subsequently been promoted or retired.[8]

After determining the value of a promotion for each officer, the district court compared the likelihood that an officer would be promoted absent discrimination with the actual rate at which the plaintiffs had been promoted. To do this, the district court used calculations provided by Dr. Boudreaux.[9] He determined that 10.7% (13 of 121) of all of the eligible officers, white and non-white, were promoted to sergeant, but that only 1.1% (1 of 90) of the white eligible officers were promoted. Thus, the discrimination caused a 9.6% (10.7% - 1.1%) change in the chances of a white

---

[8] The defendants' expert Dr. Kenneth Boudreaux also calculated the monetary value of a promotion for each individual plaintiff, but the court did not use his calculations after concluding that these calculations were based on "arbitrary" cut-offs. In determining the value of a promotion, Dr. Boudreaux's first set of calculations assumed that the plaintiffs' losses were cut-off on October 7, 1995, when the City made its next round of promotions. In his second set of calculations, Dr. Boudreaux's calculations assumed that the losses of the police officers not promoted were cut-off on April 15, 1998, and that the losses of the sergeants not promoted ended on April 16, 1999. He used these dates because that was when the next Civil Service Registers, which determine who is still eligible for promotion based on more recent test scores, were approved for each position. In rejecting these calculations, the district court also noted that Dr. Boudreaux testified that his calculations probably would have been similar to Dr. Pettingill if these cut-off dates had not been used.

[9] Dr. Pettingill did not calculate the likelihood that a plaintiff would have been promoted absent discrimination.

officer being promoted to sergeant.  He did the same analysis for lieutenant promotions, finding that 18.2% (6 of 33) of all eligible sergeants were promoted to lieutenant, but only 3.6% (1 of 28) of eligible white sergeants were promoted to lieutenant.  Therefore, he concluded that the discrimination caused a 14.6% (18.2% - 3.6%) change in the chances of a white sergeant being promoted to lieutenant.

The district court then multiplied the monetary value of the promotion as to each officer as calculated by Dr. Pettingill by the percentage differentiation that the discrimination caused as calculated by Dr. Boudreaux.  The total award for all of the Albright plaintiffs equaled $434,278.90, with each individual officer receiving different amounts ranging from $404.71 to $28,797.04 depending on that officer's particular circumstances, such as the officer's age, the officer's years of service, and whether they have subsequently been promoted or retired.[10]

---

[10]    The individual awards were as follows:  Albright, $11,259.98;  Allsbrook, $9,492.10;  Bono, $17,215.74;  Bowen, $11,647.49;  Bua, $28,797.04;  Caprera, $1,515.74;  Castellucio, $10,159.39;  Daughtry, $11,288.16;  Dejean, $9,856.03;  Dunn, $17,715.49;  Favalaro, $12,500.93;  Fayard, $11,349.22;  Firsard, $16,335.21;  Gifford, $12,637.06;  Glasser, $19,468.37;  Goodson, $9,906.53;  Hirstius, $12,650.30;  Hoogerwerf, $1,773.90;  Lee, $9,621.22;  Magana, $10,110.43;  McCaskell, $2,354.88;  McCord, $12,587.14;  Powell, $8,679.74;  Rice, $20,579.22;  Ronguillo, $10,903.39;  Saaks, $12,819.84;  Savage, $14,314.86;  Scott, $404.71;  Sedgebeer, $18,623.61;  Slicho, $14,026.66;  Smith, $10,644.77;  Stokey, $13,793.86;  Ward, $12,055.78;  Wilson, $19,855.27;  Wood, $11,424.29.

**IV.**

Both parties contend that the district court abused its discretion in calculating damages. The Albright plaintiffs take issue with the district court's pro rata methodology, arguing that the court should have either awarded the full monetary value of the promotion to each plaintiff or forced the City to promote all of the plaintiffs. Alternatively, the Albright plaintiffs argue that even if a pro rata method was permissible, the district court should have divided the total value of the promotions actually made by the number of plaintiffs. The City asserts the district court erred in using Dr. Pettingill's calculations on the value of a promotion instead of Dr. Boudreaux's calculations, which were based on cut-off dates.

**A.**

The Albright plaintiffs contend that the district court abused its discretion in using a pro rata method in determining damages because the number of promotions was not fixed. This argument is not persuasive. We have previously approved of district courts using a pro rata methodology in determining damages for Title VII plaintiffs when there were not enough positions for all of the eligible employees.[11] In fact, other circuits have held that a

---

[11] *U.S. v. U.S. Steel Corp.*, 520 F.2d 1043, 1056 (5th Cir. 1975); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 260 (5th Cir. 1974).

district court abused its discretion when it failed to use a pro rata approach in such a situation.[12]

The plaintiffs contend that our situation is distinguishable from the other situations in which a pro rata approach was used because in our case the number of officers promoted was directly tied to the number of black officers eligible for promotion. Therefore, they assert that it is impossible to tell how many promotions the City would have made absent discrimination. Because it is impossible to determine the number of promotions, the plaintiffs contend, relying on *Trout v. Garrett*,[13] a D.C. district court decision, that the application of a pro rata method would not fairly compensate the plaintiffs. As a result, they maintain that the district court should have either promoted each officer or awarded each individual officer the full value of the promotion

---

[12] *Dougherty v. Barry*, 869 F.2d 605, 614-15 (D.C. Cir. 1989)(holding that the district court abused its discretion because "the district court should have awarded each appellee a fraction of the promotions' value commensurate with the likelihood of his receiving one of the promotions"); *U.S. v. City of Miami*, 195 F.3d 1292 (11th Cir. 1999)(holding that the district court abused its discretion in a reverse discrimination case involving the Miami police department because the court awarded each plaintiff a full award even though there were not enough positions available for all the discriminated-against officers); *see also Ingram v. Madison Square Garden Ctr., Inc.*, 709 F.2d 807, 812 (2d Cir. 1983); *Hameed v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Local Union No. 396*, 637 F.2d 506, 519-21 (8th Cir. 1980); *Stewart v. General Motors Corp.*, 542 F.2d 445, 452-54 & n.7 (7th Cir. 1976).

[13] 780 F.Supp. 1396 (D.D.C. 1991).

with no reduction based on each officer's chances of receiving the promotion.

In *Trout*, a D.C. district court reviewed a Special Master's Title VII damage award for 93 female plaintiffs who had numerous distinct occupations within the Navy and were discriminated against both at hiring and during promotions over the course of seven years.[14] The Navy, relying on *Dougherty v. Barry*,[15] a D.C. Circuit opinion advocating the use of a pro rata approach, argued that the Special Master erred in not assessing damages by dividing the value of the promotions by the number of plaintiffs.[16] The district court rejected the Navy's argument and found that *Daugherty* was distinguishable because the variety in the types of positions and the uncertainty as to the actual number of vacancies made it impossible to calculate damages based on a fixed number of positions.[17]

But our situation is different. Here, there was one discrete event (the March 3, 1995 promotions), a fixed category of similarly situated individuals (officers eligible for promotion to sergeant and sergeants eligible for promotion to lieutenant), and the effect

---

[14]  *Id.* at 1400-01.

[15]  869 F.2d 605 (D.C. Cir. 1989).

[16]  780 F.Supp. at 1406.

[17]  *Id.* at 1406-08.

of the discrimination was clearly limited to the denial of a specific promotion. In contrast, in *Trout* there were 93 plaintiffs who held dissimilar jobs, were denied dissimilar promotions, and were discriminated against over the course of seven years.[18]

Moreover, during the damages trial, the district court did not receive any evidence showing that the City would have promoted a different number of officers as part of their discrimination scheme. In fact, there was evidence to the contrary. When promotions were handed out on March 3, 1995, one white officer was promoted to sergeant and one white sergeant was promoted to lieutenant. Because not only black officers were promoted, the district court was not required to conclude the scheme was intended to promote only black officers or that the number of promotions was tied to the number of eligible black officers. Therefore, the district court did not clearly err in concluding that there were a fixed number of promotions and did not abuse its discretion in using a pro rata approach because there were more eligible officers than positions. Accordingly, the district court was not required to promote every officer or to award each plaintiff the full value of a promotion.

The Albright plaintiffs also argue that even if the district court could use a pro rata approach, the district court erred in

_____

[18] *Id.* at 1401.

assessing damages because the district court should have taken the full value of each promotion,[19] divided it by the number of plaintiffs, and then awarded that amount to each plaintiff. This argument is also without merit. Calculating damages in this manner only makes sense if one assumes that the Albright plaintiffs would have received all of the promotions. But considering that the Albright plaintiffs consisted of only 23 of the 121 (19%) officers eligible for promotion to sergeant and 11 of the 33 (33%) sergeants eligible for promotion to lieutenant, this is an improper assumption.

**B.**

The City contends that the district court should have limited its calculation of damages to the date when the Albright plaintiffs were restored to a position of equal opportunity. It asserts that the district court's failure to so limit damages provides a windfall to the plaintiffs because an officer could have been promoted at any time after March 3, 1995, the promotion date at issue here. Therefore, the City contends that the district court should have used Dr. Boudreaux's calculations of the monetary value

---

[19] The value of the promotion would be based on Dr. Pettingill's calculations of the average value of a lost promotion. According to those figures, the average value of a promotion to sergeant was worth $111,817.00 and the average value of a promotion to lieutenant was worth $137,045.00. However, in making these calculations, Dr. Pettingill did not use all of his figures for the individual plaintiffs, exempting some of the lower and higher figures as statistical outliers.

-15-

of a promotion rather than Dr. Pettingill's. As explained above,[20] Dr. Boudreaux provided two sets of calculations for the value of a lost promotion. The first cut off any consideration of damages that occurred after October 7, 1995, when the City made its next round of promotions, and the second cut off any consideration of damages after April 15, 1998 for sergeants and April 16, 1999 for lieutenants. These dates are when the next Civil Service Registers, which re-determined eligibility for promotions based on new test scores, were approved.

But the City's argument is not persuasive. The district court has wide latitude in fashioning remedies in Title VII cases,[21] and the City has not shown that any appellate court has ever ruled that a district court erred in failing to limit damages by applying a cut off date. More importantly, the City has provided no evidence that the district court's award has caused any individual officer to receive a windfall. The district court's calculations reduced damage awards for officers who have been promoted in the six years since the March 3, 1995 promotion date. Finally, as the City acknowledges, the loss to the plaintiffs is a loss of the statistical probability of being promoted on March 3, 1995. Because the plaintiffs can never again be considered for that round

---

[20]   *See supra* n.8.

[21]   *Criminal Sheriff, Parish of Orleans*, 19 F.3d at 239-40.

of promotions, the loss in statistical probability is permanent; thus it is appropriate to calculate the full amount of damages for that statistical loss without regard to a cut-off date. Accordingly, the district court did not abuse its discretion in using Dr. Pettingill's, rather than Dr. Boudreaux's calculations, in determining the value of a promotion to an individual plaintiff.

## V.

Because the district court did not abuse its discretion in assessing damages in this Title VII discrimination suit, we AFFIRM.